## NATIONAL LABOR RELATIONS BOARD

### v.

### LUMMUS CO.

### No. 14520.

United States Court of Appeals
Fifth Circuit.

Feb. 12, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Elmer Davis, Chief Law Officer, N. L. R. B., Fort Worth, Tex., Frederick U. Reel, Atty., N. L. R. B., Washington, D. C., Dean E. Denlinger, Atty., N. L. R. B., Dayton, Ohio, for petitioner.

Quentin Keith, Cecil, Keith & Mehaffy, Beaumont, Tex., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

BORAH, Circuit Judge.

The National Labor Relations Board seeks enforcement of an order requiring respondent, The Lummus Company, to cease and desist from certain unfair labor practices and to take certain affirmative action which the Board found would effectuate the policies of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., as amended by the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq.

The Board and the Trial Examiner concluded that the respondent refused to hire certain specified workmen because of lack of membership in or referral by Local 1423, United Brotherhood of Carpenters & Joiners of America, herein called the Carpenter; that respondent by its discriminatory hiring policy discouraged membership in the International Association of Machinists, Lodge 1276, herein called the Machinists; that such conduct was in violation of § 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (3), and also interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, thereby violating § 8(a) (1), 29 U.S.C.A. § 158(a) (1). The Board ordered respondent to cease and desist from discouraging membership in the Machinists or in any other labor organization of employees or applicants for employment, or encouraging membership in the Carpenters or any other labor organization, (1) by conditioning the employment of properly qualified applicants for employment upon membership in, or referral by, the Carpenters, or (2) by discriminating in any other manner in regard to the hire and tenure of employment of employees, or any term or condition of their employment, except insofar as such activity may be affected by an agreement, authorized in Section 8(a) (3) of the Act, requiring membership in a labor organization as a condition of employment. The Board further ordered that respondent cease and desist from in any manner interfering with, restraining, or coercing employees or applicants for employment, in the exercise of the rights mentioned in Section 7 of the Act.[1] Affirmatively, the Board or-

1. The Board's order paraphrasing Section 7 of the Act mentions "the right to self-organization, to form labor organizations, to join or assist International Association of Machinists, Lodge 1276, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any or all such activities, except to the extent that such right may be affected by an agreement, authorized in Section 8(a) (3) requiring membership in a labor organization as a condition of employment."

dered respondent to make whole Machinists V. C. Reneau and O. F. Tucker for any loss of pay they may have suffered by reason of respondent's discrimination against them; to make available to the Board upon request all records necessary to analyze the amounts of back pay due; and to post appropriate notices at such of its respective offices, places of business, construction projects, and equipment or storage yards as are "within that part of the State of Texas within which the members of the South Texas Chapter of the Associated General Contractors operate under the terms of their agreement with the Carpenters."

Respondent, a Delaware corporation, is engaged at various places throughout the United States and in foreign countries in the designing, engineering, and construction of petroleum refineries and chemical and alcohol plants. It performs services and sells materials on a multi-state basis throughout the United States and in foreign countries; and between January 1 and November 22, 1951, was engaged in construction operations and the installation of machinery at the Taylor Refining Company in Corpus Christi, Texas, the situs of the instant case. The machinery installation work involved was of a type with respect to which the Carpenters and Machinists have a longstanding jurisdictional dispute. See N. L. R. B. v. George D. Auchter Co., 5 Cir., 209 F.2d 273; Eichleay Corp. v. N. L. R. B., 3 Cir., 206 F.2d 799; N. L. R. B. v. Local 743, etc., 9 Cir., 202 F.2d 516;

N. L. R. B. v. Cantrall, 9 Cir., 201 F.2d 853; N. L. R. B. v. Oertel Brewing Co., 6 Cir., 197 F.2d 59; N. L. R. B. v. Arthur G. McKee & Co., 5 Cir., 196 F.2d 636; N. L. R. B. v. Daniel Hamm Drayage Co., 5 Cir., 185 F.2d 1020. The principal question here is whether there is substantial evidence in the record, considered as a whole, supporting the Board's finding that respondent, in violation of § 8(a) (1) and (3) of the Act, discriminated against applicants for employment who were members of the Machinists.

There is evidence that before and during the time of respondent's temporary construction activities at Corpus Christi the recognized local bargaining group of employers engaged in construction work was the South Texas Chapter of the Associated General Contractors, herein called A.G.C. The policies and practices of A.G.C. during this interval included an agreement with the Carpenters [2] to be bound by the "Bylaws and Working Rules" of the Carpenters' Union. These bylaws forbid members of the Carpenters to work with nonmembers without special union permission; require millwright foremen to be members of the Carpenters; and further require that they hire only members of the Carpenters for any work within the jurisdiction of the Carpenters including the machinery setting work in dispute. Respondent although not a member of A. G.C. or a party to this agreement did by letter which it sent to the Board on

---

**2.** The existence of this agreement is evidenced by (1) an application to the Construction Industry Stablization Commission, dated October 25, 1951, submitted jointly by A.G.C. and the Carpenters, which contains the following paragraph: "We wish to further state that all negotiations for wages and working conditions between our Local Union and the South Texas Chapter of the Associated General Contractors have been on a verbal basis, with letters of confirmation being exchanged on all conclusions arrived at and that our By-Laws and Working Rules have been accepted by our Bargaining Agent and any changes which would affect the contractor are always negotiated and approved by them before insertion in our rules, therefore, no written agreement exists between us." (2) A letter from the Business Agent of the Carpenters to the Regional Office of the Board which states in part: "On July 5, 1950, the Executive Committee of our Local Union met with the Labor Committee of the Associated General Contractors for the purpose of discussing an adjustment in wages, and changes in By-Laws and working rules." This letter sets forth a "schedule of wages * * * agreed upon" and provides that the premium pay for "high time" and hazardous work shall remain "as it is established in our present working rules."

November 2, 1951, admit that "in the State of Texas we follow the policies and practices of the recognized bargaining group in the area, which policies and practices have been recognized and agreed upon between the employers' group and the various unions." It is undisputed that by "recognized bargaining group" respondent meant A.G.C. and although its Assistant Personnel Manager, Burke, denied that the letter referred to its hiring policy it affirmatively appears that the letter was written in response to an inquiry from the Board's Sub-Regional Office at Houston, Texas, concerning respondent's employment practices. Further, that at the time the letter was written respondent had received a copy of the charge which the Machinists had filed with the Board alleging primarily a refusal to hire Reneau and Tucker. And that despite such clear notice of the importance of its hiring policy, respondent did not, in the letter, exclude its hiring policy from the general phrase "policies and practices." This evidence of respondent's compliance with A.G.C.'s hiring policy finds further support in the testimony which shows that respondent selected Wilson, a known member of the Carpenters, to be its craft foreman over the men doing machinery setter work and gave him power to hire and fire its employees engaged in this craft. It further appears that Brown, a former member of the Carpenters and who was a responsible official of respondent, was Wilson's immediate superior and that Wilson and Brown procured all their millwright employees from the Carpenter's business agent, Echols, and did not hire anyone not a member of the Carpenters.

This brings us to the evidence of specific acts of discrimination against members of the Machinists. There is substantial evidence that Machinists Reneau and Tucker had considerable experience in machinery installation work; that they made proper application to respondent for such work on May 31, 1951, and June 1, 1951, respectively, following a method recognized on that type of job generally and by the respondent specifically; and that Brown told both applicants that membership in, or referral by, the Carpenters was requisite to employment. Wilson also informed Tucker that there was no chance of his going to work, that they didn't do any hiring there as the hiring was done entirely through the millwrights, and if Tucker wanted a job he would have to apply to Echols, take a test and pay $100.00, and that Brown would tell him the same thing. No notation was made of the names, addresses, and telephone numbers of these applicants although respondent would in a short time have need for machinery setters. Indeed, on June 5, 1951, Wilson did call Echols and did request that he send three named millwright members of the Carpenters to the job. These three individuals were thereupon hired in preference to Reneau and Tucker who would not be referred for employment under the Carpenters' bylaws and working rules which in Section 16 provides: "Any Foreman who, as long as we have men available, informs an ex-member or non-member of the Brotherhood that he will put him to work if he can obtain a card shall be fined the sum of Fifty ($50.00) Dollars for each such offense and ruled off of all jobs as a Foreman for one (1) year."

On this record, we agree with the Board that respondent maintained a discriminatory hiring policy and applied such policy to Reneau and Tucker, and that in any event there was an independent discriminatory refusal on the part of respondent to hire these men. It is clear that respondent, through Brown, discriminated against Reneau and Tucker on May 31 and June 1, 1951, respectively, and through Wilson on June 5, and that these supervisors were acting in a dual capacity for both the Carpenters and respondent. Under these circumstances there is no merit in respondent's principal argument which is that no jobs were actually available at the time the named claimants visited the machinery installation project. While it is true that hiring took place four or

five days later, the job applicants were told that they could not obtain employment unless they received clearance from the Carpenters. Where such an illegal requirement has been imposed, and it is apparent from such discriminatory hiring policy that further application for employment would be futile, the job applicants need not go through the useless procedure or reapplying for employment at the later time when jobs are actually available in order to establish that they were victims of the discriminatory hiring policy. By thus conditioning employment on membership in the Carpenters, respondent necessarily denied the applicants their statutory right to be considered for employment on a nondiscriminatory basis, that is, without regard to their union affiliation, when jobs became available shortly thereafter, as the respondent expected. N. L. R. B. v. Arthur G. McKee & Co., supra; N. L. R. B. v. Daniel Hamm Drayage Co., supra; N. L. R. B. v. Cantrall, supra.

Finally, respondent complains that the cease and desist order of the Board is too broad in its geographic scope, and also that it should order respondent only to cease and desist from the unfair labor practices of the kind found by the Board to have been committed by it. We think the order properly requires respondent to post the usual notices at all of its places of employment within the geographic confines of the South Texas Chapter of the A.G. C. since there is every reason to anticipate that if not deterred, respondent would pursue the same discriminatory policies at every project within the area embraced by said Chapter. However, we agree that the Board's order is too broad in that it prohibits respondent, in all-inclusive language, from in any manner interfering with, restraining or coercing employees or applicants for employment, in the exercise of those rights [3] and those activities guaranteed to them in Section 7 of the Act. We hold that the order must be modified so as to limit its full

effect to the restraint of the unfair labor practices found to have been committed by the respondent and other related unlawful acts. N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 436, 61 S.Ct. 693, 85 L.Ed. 930.

As thus modified, the Board's order is enforced.