**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 803, INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS AND HELPERS OF AMERICA, A.F.L., Respondent.**

No. 11281.

United States Court of Appeals, Third Circuit.

Argued Oct. 8, 1954.

Decided Jan. 12, 1955.

Samuel M. Singer, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Jean Engstrom, Attys., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Richard H. Markowitz, Philadelphia, Pa. (Louis H. Wilderman, Paula R. Markowitz, Philadelphia, Pa., on the brief), for respondent.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is a petition to enforce a Labor Board order designed to correct an alleged unfair labor practice of a labor union. The cease and desist provisions of the order would restrain the union in its dealings with two employers from violating Section 8(b) (1) and (2) of the Labor-Management Relations Act, 61 Stat. 136(1947), 29 U.S.C.A. § 151 et seq., by "enforcing a preferential hiring arrangement", " * * * causing or attempting to cause [the employers] to discriminate against employees or prospective employees", or "in any other manner coercing employees or prospective employees in the exercise of the rights guaranteed by Section 7 of the Act" except as far as any such conduct may be sanctioned by a union shop contract of the sort which Section 8(a) (3) validates. Affirmatively, the order requires that the union make whole three workmen, Forte, Garafolo and Matkowski, "for any loss of pay they may have suffered as a result of the discrimination against them".

Most of the contention here has centered around the construction and validity of a union shop agreement between the union and the two ship servicing com-

panies, Harbor Ship Maintenance Co. and Camden Boiler Cleaning and Maintenance Co., hereinafter designated as Harbor Ship and Camden Boiler. However, we do not find it necessary to reach that question because it seems clear to us that permissible findings made by the Board as to the discriminatory hiring practices which the union actually imposed on Harbor Ship and Camden Boiler established unfair labor practices which are clearly outside of the limited protection which Section 8(a) (3) gives to union shop arrangements.

The order sought to be enforced was entered by the Board on its own findings and conclusions after the Trial Examiner had recommended dismissal of the complaints. The union insists that on the record the Board could not reasonably have reached a conclusion different from that of the Trial Examiner. This issue is best approached by comparing the findings of the Trial Examiner and the findings of the Board concerning the circumstances under which the three workmen failed in an effort to obtain employment with Harbor Ship in mid-February 1953. The Trial Examiner found as follows:

"As to hiring at Harbor Ship, the testimony of Subnick [the managing proprietor] establishes that none of the three complainants was on his 'steady' list, that is, the list of workers customarily hired from the 'shape-up' before extras were employed on any specific job. On the morning of February 15 or 16, all three complainants 'shaped up' at Harbor, where they were told by Subnick that the union steward, one Ledyard, had told him that they were delinquent in payment of dues and should not be hired. They were not hired. According to the testimony of Subnick, which the Trial Examiner believes as to this point, although he told the three men Ledyard had reported them as delinquent, he could not be certain that there were jobs available for any one of the three that morning. Some-

times men who were extras, like these three, would be hired and sometimes not. In the absence of substantial and credible evidence establishing that there were jobs available for them that morning, it plainly cannot be found that they were refused employment."

The Board's findings were similar to the Examiner's in most respects:

"Late in January or early February, 1953, the Respondent's shop steward at Harbor Ship, Chester Ledyard, showed Subnick, Harbor Ship's manager, a list containing approximately 15 names of members, including the 3 charging parties, who had lost good standing membership because of their non-payment of dues. He said to Subnick, according to his own testimony, that 'these fellows could go to work after the paid up fellows went to work, the fellows with paid up books, but before that, they couldn't go.' According to Subnick's testimony, he also said 'as of today, you are not to hire any of the men that hang around the Riverside Hotel because most of them are delinquent in dues.'

"On February 15 or 16, 1953, the 3 charging parties heard from Subnick's partner that Harbor Ship was hiring on that day. They went to the 'shape up' at Harbor Ship, but were told by Subnick that they could not be hired because of their dues delinquency. Other men were hired on that day. While Subnick could not recall whether sufficient jobs were available to take on the 3 charging parties if they had been in good standing in the Union, he was definite in his testimony that the reason why he refused them employment was their dues delinquency * * *."

Underlying these findings was testimony that workmen were hired for ship maintenance and servicing operations on a daily basis, with limited recognition of seniority and experience with the employing firm accomplished through the em-

ployer's maintenance of a list of its "steady" men. Those whose names appeared on this list were hired first and thus obtained very frequent, though not continuous, work.[1] Whenever this seniority list failed to provide enough workers, extra men were hired on a casual basis as needed from day to day. It does not appear that an applicant for such work enjoyed any seniority rights based on previous casual hiring so long as the individual had not won a place on the "steady" list. But there was substantial testimony that the employers at the union's behest accorded priority in the casual hiring of extras to those who exhibited union books evidencing their good standing. Those who did not have such books, or whose names had been submitted to the employer by the union as not in good standing, were hired, if at all, after the financial union members. And even after hiring they might be, and at times were, "knocked off" on the union's showing that financial members were available and seeking work.

The complainants here testified that they suffered both types of discrimination. The already mentioned occurrence in mid-February was a refusal to hire. There was also testimony of later occasions when a complainant was hired as an extra, but was "knocked off" as soon as the union representative found him working and demanded his removal. It seems to us that such dismissals almost immediately after hiring as well as refusals to hire in first instance can properly be viewed as part of a pattern of discriminatory action which implemented a comprehensive requirement of the union that its paid-up members who did not belong to the "steady gang" should be given employment preference over unfinancial members and non-members. This priority accorded to currently financial union members in the casual hiring

of extra workmen seems to have been categorical and unqualified in that the parties gave no effect to any number of days a particular applicant may previously have worked for the employer or even to his union status when last laid off.

■ Thus, on the evidence and on the findings of both the Board and the Trial Examiner we think it was adequately established, in the words of the Board, "that the Respondent Union and the two employers have in practice agreed upon and are carrying out a hiring arrangement whereby preference in hiring is given first to members of the Union in good standing, then to members of the Union not in good standing, and finally to non-Union members."

■ As we read the record, the Examiner thought the complaints should be dismissed principally because he was unable to find a clear causal connection between the preferential employment scheme and the employers' failure to hire the complainants on particular occasions. The Examiner found it unclear whether when the complainants applied unsuccessfully for work there were extra jobs enough to assure their employment had there been no discrimination. Therefore, he was unable to find affirmatively whether discrimination in favor of financial union members or the insufficiency of available work prevented the complainants from being hired. But whether or not there was work enough for all applicants, the record is clear that because the complainants were delinquent in union dues the employers refused to consider them on an equal basis with union men in good standing who were applying for such extra work as was available. This denial of equal access to the available jobs was in itself and without more a restrictive imposition in violation of the Act. N.L.R.B. v. Lummus Co., 5 Cir. 1954, 210 F.2d 377; Eichleay Corp. v. N.L.R.B.,

---

1. The Board long since seems to have recognized that the members of such a "steady" group, though not employed continuously, enjoy a significant continuing status as employees which does not attach to truly casual employment. Cf. Weinberger Banana Co., 1939, 18 N.L.R.B. 786; Todd Shipyards Corp., 1938, 5 N.L.R.B. 20.

3 Cir. 1953, 206 F.2d 799; cf. Del E. Webb Construction Co. v. N.L.R.B., 8 Cir. 1952, 196 F.2d 841. It did not have to appear affirmatively that the complaining member of the disadvantaged class would have been one of the persons hired for such jobs as were available on the day he applied. Thus the Board quite properly reached a conclusion contrary to that of the Examiner.

We do not decide whether the discrimination against the complainants would be illegal if unaccompanied by the absolute preference in hiring given to financial union members, at the expense of new non-union employees as well as non-union men and delinquent union members seeking re-employment. In such a case, the application of the union shop provisions of Section 8(a) (3) would have to be considered. But where, as in this case, a complainant has been denied work through a more comprehensive preferential arrangement clearly not sanctioned by Section 8(a) (3), the discriminatory action may not be excused on the ground that, by proceeding within the compass of a narrower union security arrangement, the parties might validly have accomplished the same result. Cf. Green Bay Drop Forge Co., 1951, 95 N.L.R.B. 399; H. O. Wheeler, 1954, 108 N.L.R.B. No. 127, CCH N.L.R.B. Decisions Par. 13,392.

Finally, both because of the casual and occasional nature of the work in controversy and because of the preference accorded the "steady gang" it is not clear to what extent each complainant was injured by the unlawful hiring practice. However, this is a matter properly left to be determined in the administration of the affirmative part of the order which requires that the union make these complainants whole.

The order in suit will be enforced.

McLAUGHLIN, Circuit Judge, concurs in the result.