**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 12, AFL, Respondent.**

**No. 15003.**

United States Court of Appeals Ninth Circuit.

Oct. 9, 1956.

Rehearing Denied Dec. 4, 1956.

Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Frederick U. Reel, Atty., NLRB, Washington, D. C., for petitioner.

David Sokol, Los Angeles, Cal., for respondent.

Before STEPHENS, ORR, and HASTIE, Circuit Judges.

ORR, Circuit Judge.

The National Labor Relations Board, hereafter the Board, petitions this court to enforce its order against the International Union of Operating Engineers, Local No. 12, AFL, hereafter Local 12.

Local 12, together with other construction trade unions, has a collective bargaining agreement with Associated General Contractors, hereafter AGC. The legality of the agreement as such is not challenged in this cause.

The agreement provided that the union would establish and maintain an open and nondiscriminatory employment list in the work area jurisdiction of each respective local union of each particular trade. AGC members would first call the union when they needed men in certain work classifications. The agreement set up a priority system for job referrals, with the highest priority for jobs going to workmen who had recently been laid off by AGC members who desired to reemploy the same workmen in the same area. Second choice went to workmen who had been employed by AGC members in the union's area jurisdiction during the previous ten years. The last group on the priority list were workmen whose names were entered on the lists in the area.

The agreement between the union and AGC also provided that all workmen covered by the agreement would become members of the union no more than thirty days after employment, and as a condition of employment.[1]

Based on the agreement, Local 12 operated a job referral dispatch system to supply the requirements of AGC members for operating engineers and allied classifications. The union maintained two referral lists; the first was headed "Members" and included all members of that union who had reported that they were seeking work. The second list was called "Applicants and Others," and included nonunion workmen who had applied at the dispatch office for work within the union's jurisdiction, and also

---

1. 29 U.S.C.A. § 158(a) (3) authorizes such a provision.

members of other locals who had transferred into the geographical jurisdiction of Local 12.

The dispatcher would first examine the "Members" list for a workman of the classification desired; if none were available, the dispatcher would then go to the "Applicants and Others" list. An individual dispatched from the second listing made an application to join Local 12, and was required to pay a work permit fee of $2.50 per week, pursuant to the International Union's constitution, which provision was not incorporated into the agreement with AGC.[2]

Pursuant to alleged grievances made by Frederick R. Hummel, Robert A. Holderby, and Hoyt Covert, the General Counsel of the National Labor Relations Board issued a complaint against Local 12, alleging that the union was engaged in unfair labor practices affecting commerce within the meaning of § 8(b) (1) (A) and (2) of the Labor Management Relations Act, and § 2(6) and (7) of that Act.[3]

The alleged practices against Local 12 were the following: (1) operating the dispatch system to give preference to union members; (2) requiring nonunion applicants for employment to apply for union membership immediately upon referral; (3) imposing work permit fees on nonunion employees in AGC; and (4) discriminating against Robert A. Holderby in not giving him his fair share of job referrals because of his expulsion from the union.[4]

The Trial Examiner held the dual lists were in accord with the priority arrangement in the union security agreement, in that only union members would have worked for AGC contractors within the past ten years, and would qualify for the second tier of priority. The Trial Examiner found that there was no proof that the signing of an application for membership in the union was a condition precedent to the securing of a referral; and that there was no showing that the signing was not with the individual applicant's consent and for his individual convenience, in that he had to join within thirty days of his employment with an AGC contractor.

With respect to Holderby, the Examiner found a correlation between his suspension from the union and lack of work referrals, but held that it was incumbent upon the General Counsel to show the availability of employment for which the claimant was qualified and a refusal by Local 12 to refer him thereto, in order to show discriminatory treatment within the meaning of the Act.[5]

---

2. Article XV, § 3(e) of the International Union's constitution provides: "Each Local Union permitting its applicants for membership to engage at the craft, upon work under contract with, or control of, said Local Union, shall charge to and collect from each such applicant, and each such applicant shall be required to pay to it for the period involved, minimum weekly permit dues of $2 in the case of each applicant hoisting and portable engineer or apprentice, and minimum monthly permit dues of $2 in the case of each applicant stationary engineer or apprentice, and shall thereupon issue to each such applicant a temporary permit similar to the Journeyman Engineer's Temporary Permit provided in this Article."

3. 29 U.S.C.A. § 158(b) (1) (A) and (2), and § 152(6) and (7).

4. The complaints by Hummel and Covert appear to have been dismissed.

5. The Trial Examiner's intermediate Report stated: "Holderby's uncontradicted testimony is that he was always available for employment and indeed sat around the hall for months looking for jobs. This testimony is all the more impressive when his 1954 record is examined. Thus, for no apparent reason, and two days after the issuance of the complaint therein he is suddenly referred to a job for the first time in 11 months and is thereafter kept at work with the same general degree of frequency as he had been prior to his expulsion from the Union, while his name remains on the same list, i.e. the 'Applicants and Others' list. Then, when it becomes apparent that he will not drop the charge, but will continue the case, the supply of jobs is shut off just as abruptly as it was started. There is no evidence that jobs suddenly became more available in June, that jobs had not been available all along and the inference is unmistakable

The Trial Examiner recommended that the charges be dismissed.

The Board refused to follow the recommendation of the Trial Examiner, and ordered the union to cease and desist from the practices complained of, and to make Holderby whole for the discrimination against him.

The Board determined that as a matter of practice union members were given job preference, citing Holderby as an example. He had been discharged from the union and his name removed from the preferred list, despite his preferential status as a former worker within the AGC unit. The Board also found that nonunion employees in fact could not exercise a free choice between applying for union membership immediately, or after the first thirty days of employment; that job applicants were aware that their only chance of obtaining employment with AGC employers was through Local 12's dispatching office, and thus were impliedly coerced into cooperation with the union and its membership practices. The Board also found that the permit fees charged nonunion members was a discrimination against them, since union workers were not charged such fees. It found that there was a lack of proof that the special charge levied upon the nonunion applicants was in any manner related to the cost of operating the dispatch system for their benefit.

■ An attempt to cause an employer to discriminate against an employee in violation of § 8(a) (3) constitutes a violation of § 8(b) (2) even though the employer did not as a matter of fact discriminate.[6] See N. L. R. B. v. International Longshoremen's and Warehousemen's Union, 9 Cir., 210 F.2d 581, 583, where it is said:

"'* * * Thus a literal reading of the section requires only a showing that the union caused or attempted to cause the employer to engage in conduct which, if committed, would violate § 8(a) (3).'"

See also Radio Officers, etc. v. N. L. R. B., 347 U.S. 17, 53, 74 S.Ct. 323, 98 L. Ed. 455; and N. L. R. B. v. George D. Auchter Co., 5 Cir., 209 F.2d 273, 277.

■■ We have reviewed the Board's findings to determine whether there is substantial evidence to support them and in so doing considered not only that which supports, but also whatever in the record fairly detracts from its weight. The scope of our review includes the findings of the Trial Examiner, since it is part of the record, and deserves some weight because of his opportunity to have observed the demeanor of the witnesses.

"We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony." Universal Camera Corp. v. N. L. R. B., 340 U. S. 474, 496, 71 S.Ct. 456, 469, 95 L. Ed. 456.

■ Thus viewing the entire record we find no support for the Board's findings of unfair labor practices alleged to have been committed by the labor union, with the exception of acts of discrimination against Holderby.

that his referrals to jobs was not based upon his location on the list without regard to other factors."

6. 29 U.S.C.A. § 158(b) provides: "It shall be an unfair labor practice for a labor organization or its agents—

*   *   *   *   *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership".

674

The record discloses as to the alleged discriminatory operation of the dispatch system that although the system devised by the union for preference in referrals could conceivably admit of a discrimination against a nonunion workman, there was no evidence of a scheme or practice of discrimination by the union. The only instance of that kind shown was that of Holderby, and a single isolated incident of this type cannot support a cease and desist order. See N. L. R. B. v. Amalgamated Meat Cutters, 9 Cir., 202 F.2d 671.

The Trial Examiner found adverse to the petitioner on this contention because of lack of evidence to support the claim. We think he was correct.

With respect to the alleged requirement that nonunion applicants take out union membership applications on their first referral, the Trial Examiner's holding was that there was no showing of a requirement as a "practice" by the union.[7] The convenience of an immediate application under the thirty day period is obvious, and it was necessary to establish by competent evidence that the union actually required this of nonunion workers in order to support a finding of an unfair labor *practice* within the meaning of the Act. We agree with the Trial Examiner as to lack of evidence on this point.

There is no evidence in the record with respect to the work permit fees being required of nonunion workers, except that such a provision is contained in the Constitution of the International Union of Operating Engineers. It is not established, first, that Local 12 was requiring such fees, and second, that said fees were not a reasonable charge for operating the dispatch system, and hence not a discriminatory practice against nonunion members.

■ There is sufficient evidence to support the Board's finding of a discrimination against Holderby. The pattern of job referrals shown in evidence, coupled with the "switch" of his name from the "Members" list to the "Applicants and Others" list, warrants a finding of a discrimination in violation of 29 U.S. C.A. § 158(b) (2).[8] Holderby's applications were handled in a manner giving rise to a strong conviction that the union and Holderby were bitterly antagonistic, one to the other. The time intervals between the job referrals given Holderby are significant. After he instituted legal action against Local 12, his referrals were more frequent, evidently in an attempt at appeasement; but when Holderby refused to discontinue the legal action, the referrals again became infrequent. This circumstance is persuasive.

Under the circumstances the order of the Board is too broad. The Board is ordered to modify its order so as to require respondent Local 12 to make Holderby whole, the amount thereof to be determined in post-decree compliance proceedings. See N. L. R. B. v. Local 803, International Brotherhood of Boilermakers, etc., 3 Cir., 218 F.2d 299. In all other respects the order of the Board is set aside.

Cause remanded to the Board with directions to modify its order in accordance with the views herein expressed, and the order so modified is ordered enforced.

7. The Trial Examiner's Intermediate Report stated: " * * * The fact that it was the 'practice' to have such an employee sign an application for membership at the time of his first referral is not proof that the signing of such an application for membership was a condition precedent to the securing of the referral—which, if true, would be definitely a violation of the Act. However, there is no showing in this case of any such illegal requirement. Nor is there any showing here that this signing was not with the individual employee's consent and for his individual convenience. * * * "In the absence of proof that the making of application for membership and the payment of all or a part of the fee was a condition precedent to the referral to the job, the undersigned would be guessing and conjecturing, if he held such an indefinite 'practice' to be violative of the Act."

8. See Note 5, supra.

HASTIE, Circuit Judge (dissenting in part).

This court is enforcing against the defendant labor union so much of an order of the National Labor Relations Board as gives effect to the board's conclusion "that by removing Holderby's name from the 'Member's' list because of his expulsion from the Union, thereby denying him equal access to jobs, the Respondent * * * violated Section 8 (b) (2) and (1) (A) of the Act." While this language places formal reliance upon two clauses of Section 8(b), namely clauses (2) and (1) (A),[1] the opinions of the board and this court make it clear that both tribunals have analyzed the Holderby matter as essentially a violation of clause (2) without reference to the different considerations upon which an invocation of clause (1) (A) must depend.

To make my view of the matter clear, I shall consider those clauses separately. Cf. National Labor Relations Board v. Philadelphia Iron Works, 3 Cir., 1954, 211 F.2d 937, 943–944.

I think the union's action with reference to Holderby did not constitute a violation of clause (2) of Section 8(b). The issue under that clause is whether the union caused or attempted to cause any employer to discriminate against Holderby in violation of the Act. In resolving that issue it must be determined whether the union caused or attempted to cause an "employer to engage in conduct which, if committed, would violate Section 8(a) (3)."[2] Radio Officers' Union v. National Labor Relations Board, 1954, 347 U.S. 17, 53, 74 S.Ct. 323, 342, 98 L.Ed. 455.

In this case no employer was told or even given reason to believe that Holderby or anyone else was being treated improperly in the matter of job referral. No one brought to any employer's attention any charge that the union was abusing the lawful referral arrangement to which various employers had subscribed. At most the union was accomplishing an effective discrimination against Holderby without causing or attempting to cause any employer to act improperly in any way.

In this all-important respect the present case differs from the numerous adjudicated cases in which the board and the courts have found violations of Section 8(b) (2). Those cases characteristically reveal either aggressive wrongdoing by the employer himself or his acquiescence and cooperation in making misconduct on the part of the union injurious to some employee.[3]

---

1. Section 8(b) of the National Labor Relations Act, as amended, 61 Stat. 140, as amended, 65 Stat. 601, 29 U.S.C.A. § 158 (b) (1) (A) and (2), reads in pertinent part as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this Act * * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *."

2. That subsection makes it an unfair labor practice for an employer "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *". 29 U.S.C.A. § 158(a) (3).

3. See, e. g., National Labor Relations Board v. Local 803, International Brotherhood of Boilermakers, AFL, 3 Cir., 1955, 218 F.2d 299 (On union demand the employer fired and refused to hire men not in good standing in the union); National Labor Relations Board v. International Union of Operating Engineers, AFL, 8 Cir., 1954, 216 F.2d 161 (Employees discharged in accordance with union seniority rules though employer's rules provided otherwise); National Labor Relations Board v. Philadelphia Iron Works, 3 Cir., 1954, 211 F.2d 937 (Union caused employer to withdraw job offer); National Labor Relations Board v. George D. Auchter Co., 5 Cir., 1954, 209 F.2d 273 (Employer refused to employ applicant because of union's refusal to issue referral); National Labor Relations Board v. Bell Aircraft Corp., 2 Cir., 1953, 206 F.2d 235 (Employee denied promotion because union charges pending against him).

National Labor Relations Board v. International Longshoremen's Union, 9 Cir., 1954, 210 F.2d 581, deserves special mention because it is a very recent decision of this court. But there too the employer was chargeable with knowledge of and responsibility for the misconduct of certain wrongdoing dispatchers, because those dispatchers were employees of the employer as well as the union and were subject to removal by an employer-union committee.

In the present case the board has made a passing, but in my view unsuccessful, effort to charge employer with complicity in or responsibility for the union's alleged wrongdoing. In a footnote the board refers to the employer's duty "to insist that the Union fulfill its contractual obligation of maintaining non-discriminatory hiring lists." I think it would be unfair and irrational to impose such a duty unless and until the employer is at least put on notice that the union is improperly discriminating against someone in the making of referrals. And, I know of nothing in the Act or its history that suggests legislative intention to burden the employer with ferreting out union misconduct on penalty of being charged with complicity in that which he has not discovered.

The foregoing analysis leads me to agree with the member of the board who dissented in this case that the record does not establish a violation of Section 8(b) (2).

The problem presented under Section 8(b) (1) (A) is different. That clause makes it an unfair labor practice for a union to restrain or coerce employees in the exercise of freedom of choice in matters of organization, bargaining and concerted activities. The opinion of the board does not address itself to this aspect of the union's dealings with Holderby. We are not told upon what facts the board relies or how it has arrived at the conclusion that a violation of this clause is established on the present record. This deficiency is a matter of concern because the record does not make it clear why Holderby was dropped from

the union or why his subsequent request for reinstatement was denied. It does appear that his controversy with the union has reached the stage of litigation in the state courts. It is not clear whether a violation of clause (1) (A) should have been, or would have been, found had the board directed its attention with particularity to that clause rather than clause (2).

In these circumstances, I would send the case back to the board for the specific purpose of reconsidering the Holderby matter solely as a possible violation of clause (1) (A). I would withhold judicial review of this issue until the considered judgment of the board is revealed by findings and conclusions which place the matter and the board's view of it in clear focus. In all other particulars I would deny the petition for enforcement.