**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 568, HOTEL, MOTEL & CLUB EMPLOYEES UNION, AFL–CIO, Respondent.**

No. 14618.

United States Court of Appeals Third Circuit.

Argued March 20, 1964.

Decided June 22, 1964.

Robert A. Armstrong (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Alan R. Howe, Philadelphia, Pa. (Edward Davis, Philadelphia, Pa., on the brief), for respondent.

Before McLAUGHLIN, GANEY and SMITH, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This litigation is the result of the existing method of hiring extra banquet waiters for the hotels in the Philadelphia, Pennsylvania area. Prior to 1959, the collective bargaining agreement between Respondent and the hotels, represented by their association, contained a closed shop provision and all such waiters were hired through Respondent. In 1959, the Supreme Court in Hotel Employees Local No. 255, et als. v. Leedom, etc., et al., 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143, ruled that the N.L.R.B. must assert its jurisdiction over the hotel industry as a class. Following that, the Board promulgated its jurisdictional standards for hotels in Floridian Hotel of Tampa, Inc., 124 N.L.R.B. 261 (1959). In accord therewith, the 1959 contract between Respondent and the Hotel Association contained a thirty day union-shop clause and a permissive arrangement of hiring

through the union in place of the latter being the exclusive source. The new clause read in pertinent part "When in need of employees, Employer may apply to the office of the Union." This change did not affect the closed shop contracts with those hotels that were not within the monetary jurisdictional limitations fixed by the Board. The Board confined its jurisdiction to " * * * hotel and motel enterprises, exclusive of permanent or residential hotels and motels, which receive at least $500,000 in gross revenues per annum." Floridian Hotel of Tampa, supra 264.

The radical hiring change in the 1959 bargaining agreement was in effect for about the first three months of the contract. After that the hotels resumed their former practice of hiring their extra banquet waiters entirely through Respondent. The hiring of Negro extra banquet waiters is not truly involved in this present problem. It is clear from the record that the rare times Negro waiters were requested, they were furnished from the local committee on Human Relations.

Respondent operates a Banquet Department in order to take care of the extra waiter placements. To be eligible for this type of assignment, a member must be in good standing and have signed an application in which he agreed to be available for picketing and distributing union literature. A member violating this forfeited his Banquet Department status and was not allowed to attend its meetings. In September 1961, the Banquet Department passed a resolution the nature of which was disputed at the hearing. The Trial Examiner credited the version of Stoltz, the president of the Respondent who claimed that the no-work resolution involved did not apply to nonunion or suspended members who had not obtained their employment through the Banquet Department. Sydney Axelrod and another witness testified that the resolution was to the effect that the Banquet Department waiters were not to work with non-union waiters or suspended members who had obtained

their employment through sources other than the Banquet Department. The Trial Examiner accepted the Stoltz version primarily because of the testimony of the manager of five Philadelphia hotels regarding the employment of Negro waiters. The Board received the evidence of the other witnesses as " * * * more in accord with customary union practice, and because on two occasions, in the fall of 1961, extra banquet waiters supplied by Respondent refused to work with both union and non-union waitresses not booked through Respondent, which is consistent with the General Counsel's version of the rule. The Trial Examiner refused to give probative weight to either of these incidents for reasons which we regard as invalid. (The incidents are considered here as evidence corroborative of the General Counsel's version of the disputed union resolution.)"

The particular events which precipitated the Board's action revolved around Sydney Axelrod. He had been working as an extra waiter in Philadelphia since 1947. He was an organizer for the union for two years until May 1961, when Stoltz dismissed him. He reregistered as a member of the Banquet Department in September 1961 and received work assignments in regular rotation. He went to the general membership meeting that month. There, according to Axelrod, Stoltz introduced a resolution that " * * * in order to be eligible to—for the banquet department, each banquet waiter must picket one hour a week, distribute literature or do organizational work whenever deemed necessary by the Union, and agree not to work with anybody who is not a member of the Union." Axelrod inquired of Stoltz whether in the event a person does not adhere to the resolution " * * * is there any disciplinary action; * * *." Stoltz answered him saying "Yeah, * * * you don't work, and you can take that to the National Labor Relations Board." Stoltz reiterated this to Axelrod when the latter went to register after the meeting. At that time Stoltz told him that the union waiters " * * * were not allowed to work

with anybody that did not appear at that booking by the Union. We were to refuse to work with them." In December 1961 at another meeting Axelrod said that he was berated by Stoltz who called him " * * * a louse, creep, and a rat because I was asking questions of the different Board members regarding the finances of Local 568 and so forth. And, he named me to the people and told the people there at that particular Banquet Department meeting that they should spit on me every time they see me." In February 1962, he received a notice that charges had been filed against him. During that period he went regularly to the union hall for work assignments. He said "We usually averaged about five dinners a week and three or four lunches a week." He was tried on the charges against him on March 2, 1962. The next day he received a letter from the Trial Board saying he had been found guilty on all charges and suspended subject to general membership meeting action. On March 8, 1962, he was refused admission to the hall. The sergeant at arms of the union, Stanley Drobiel, and the treasurer, John Timperio, told him he could not come into the hall because he was a suspended member of the local.

From then on he never obtained any further employment as an extra banquet waiter through Respondent. He tried to obtain that type of work by direct application to at least three of the large Philadelphia hotels. At the Warwick, he talked with the manager who told him " * * * that his sole source of supply was Local 568 and he didn't get any waiters from any place else." At the Bellevue-Stratford, he explained his plight to the manager. He said, "I would like to apply directly to you for banquet work because I am suspended member of the Union, and they won't allow me to the hall." The manager advised him " * * * that his sole source of supply for banquet waiters was Local 568." He next went to the Sheraton and saw the director of personnel who told him the same thing. He didn't make any more applications because "Well, it was futile. They wouldn't give me any work unless I came through the Union." We find no denial of this in the record. Wilkinson of the Sheraton did testify that the hotel had no objection to the hiring of Axelrod but stated that the hotel did not accept his offer to work. He was content to say as to hiring banquet waiters on his own, "It is definitely not feasible."

The Trial Examiner concluded that there was no agreement express or implied between the hotels and the union requiring the former to hire extra banquet waiters through the union; that there was no evidence that the union placed any impediment in the path of the hotels or attempted to inhibit them from hiring extra banquet waiters from other sources; that the refusals of the Warwick and Sheraton to employ Axelrod were due to the independent volunteer acts of these hotels solely for their own convenience. Regarding the Bellevue-Stratford, the Trial Examiner concluded that Axelrod had ceased to be an employee of that hotel on or about March 4, 1962, for reasons unconnected with the union. The Examiner did find that Respondent had violated Section 8(b) (1) (A) of the Act since March 8, 1962 by refusing to refer Axelrod to work as an extra banquet waiter in hotels which were members of the Association other than the Bellevue. This particular conclusion is of no present importance. The Board found that " * * * the continuance after October 1959 of the hotels' practice of hiring extra banquet waiters in the first instance exclusively through Respondent was not solely voluntary, but was caused by an agreement or understanding with Respondent to continue the preexisting practice which was reinforced by the knowledge that as a result of a union resolution waiters booked through Respondent would not work with waiters obtained elsewhere. We find, therefore, that by refusing for discriminatory reasons to consider Sydney Axelrod for referral as an extra banquet waiter, Respondent caused hotel employers to discriminate against him in hiring, thereby violating Sections 8(b) (2) and

(1) (A) of the Act" 141 N.L.R.B. 310, 314 (1963). In view of its above decision, the Board because it had found Respondent guilty of violating Section 8(b) (1) (A) and that the remedy for any further violation thereof as found by the Examiner would be the same as for the violations already found by the Board, considered that it was unnecessary to pass upon the Examiner's further finding of an independent 8(b) (1) (A) violation.

■ The important affirmative question in this proceeding is, whether on the whole case there was substantial evidence in support of the Board's conclusion that there was at the very least an implied understanding between the hotels and the union whereby the former hired their extra banquet waiters solely through the union, with the waiters so obtained bound by their local's resolution not to work with waiters from other sources.

The evidence is overwhelming that the prior practice of obtaining all banquet waiters from the union had been resumed in 1960 after a three months interlude following the assumption of jurisdiction by the Board. Stoltz, the president of the union, testified that after a confusing ninety day interval, during the last part of 1959, "And, it also was only in the early part of 1960 that there seemed to be a consistency of requests from the employers of extra banquet people." He was asked "And has that consistency of requests continued to the present date?" He answered, "Yes, it has." He insisted on stating very explicitly that where a member of the union was not allowed to be booked out of the Banquet Department, "The only thing he is missing is the very lucrative job of the Banquet Department." Stoltz was corroborated by the manager of the five hotels above referred to who said it was the normal procedure that the union would call or be called first as to banquet waiters. The only exception he mentioned was calling or being called by the Committee on Human Relations with reference to Negro waiters. Mr. Goodis, the attorney for the Hotel Association, made it very clear that the Warwick Hotel, about which he was asked, since 1959 " * * * called or would call the Union to furnish it with banquet waiters other than the chain gang waiters." The witness carefully stated that this was " * * * to suit its own convenience and not as a result of any contractual provision or understanding with the Union * * *." Wilkinson, the Sheraton Hotel personnel director, further supported Stoltz. He told that he went to Local 568 for waiters in addition to his regular staff. He also took pains to note that he did this as a matter of convenience to himself.

The only reasonable inference from all of the testimony is that after the first three months of the Board's supervision, the Philadelphia hotels and Respondent, for all practical purposes, resumed their old, what had been mandatory, hiring arrangement with respect to extra banquet waiters. The new written contract of itself did not make compulsory the Banquet Department's first call on such jobs. It could not under the law. The contract, however, did provide for the continuance in effect of the old hiring hall, when the union agreed to "Maintain an office in Philadelphia * * * and shall communicate to Employer the address of said office * * *." And there is no denial that the hotels were entirely familar with the union's requirements that only members in good standing with the Banquet Department would be sent out on the jobs and that they were bound to refuse to work with anyone not a member acceptable to the Banquet Department of Local 658. Actually there were at least two separate instances occurring in Association Hotels during the fall of 1961 which are in the record where respondent's members refused to work, first, with a non-member who had not been placed by their Banquet Department and second, with a member who had not been present at the booking meeting where the waiters for the affair had been assigned. Under all the circumstances it was a reasonable inference that the Hotel Association was familiar with the union's open practice in this respect.

It is remembered that the hotel management witnesses who testified in the General Counsel's case meticulously stressed that they sought the particular needed employees in the first instance from the union for their own convenience. With the latter element apparently uppermost in the minds of the hotel people it is strange that they rejected a most experienced waiter, personally before them, asking for employment. Even more strange under the circumstances, that the rejections were specifically because the hotels hired solely from the union.

It is not difficult here to determine the substantiality of evidence on the record, including the Examiner's report. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Flack v. N. L. R. B., 327 F.2d 396 (7 Cir. 1963). The report, in the face of the evidence above outlined, concluded that the record shows that the respondent was not the employer's sole source of supply of extra banquet waiters in the first instance after the Board took over supervision of the hotels. As we noted earlier this is founded entirely on two instances where Negro waiters were obtained through the proper city agency and because the testimony of Stoltz " * * * in this regard was not corroborated by hotel officials." The hirings of the Negro waiters were special matters conducted through the municipal Human Relations Committee. The Stoltz evidence, as we have seen, was thoroughly supported by the Hotel Association witnesses.

The Trial Examiner held that exclusive hiring through Respondent alone would not establish the existence of an arrangement requiring such practice be followed. The deep significance of the two record instances illustrating that most effective union resolution prohibiting its members from working with non-Banquet Department waiters is negated by the Examiner. He advances four reasons why the Drake Hotel episode proves nothing. He does admit that the extra banquet waiters there were supplied by the Respondent and that they did refuse to work with the waitress in question because she had not been assigned by the Respondent's Banquet Department. In the Adelphia incident, where Respondent's waiters refused to work until an unassigned waitress left the floor, it is impossible to accept the Examiner's conclusion that the girl in informing her employer, the Adelphia, that she was leaving the floor did not mention who had forced her to do so and why. Because he was so persuaded, he found that " * * * the General Counsel had failed to establish that the management of the Adelphia learned the details of the incident related above, and has failed to prove any communication between the Respondent and the hotels, or any pressure, threat, or hint of reprisal, whereby the hotels were intimidated."

We do not think that the Trial Examiner's conclusion is merely less substantial than that of the Board. We think that in the situation it was, at most, tenuous and that it must fall in the face of the Board's reasonable, soundly supported determination that the hotels were aware of the union resolution. It follows that, while having a primary source of waiter supply from the union might well have been convenient for the hotels, the use of only Respondent's approved personnel meant far more than simply convenience to the hotels. It gave them complete assurance that their banquets and the like would not be ruined by the bulk of the waiters walking off the floor and refusing to work.

The Board's decision that Local 568 violated Section 8(b) (2) and (1) (A) of the Act by refusing to approve Axelrod for banquet waiter employment because of his suspension from membership is called for by the record before us. It is in strict accord with the landmark Camera opinion, supra. And see N. L. R. B. v. Local 1566, International Longshoremen's Ass'n, 278 F.2d 883, 886 (3 Cir. 1960), cert. den. 364 U.S. 890, 81 S.Ct. 223, 5 L.Ed.2d 187 (1960), cert. den. 366 U.S. 909, 81 S.Ct. 1083, 6 L.Ed. 2d 234 (1961); N. L. R. B. v. Local 420, United Association of Journeymen, etc.,

239 F.2d 327, 330 (3 Cir. 1956); N. L. R. B. v. Local 803, International Brotherhood of Boilermakers, etc., 218 F.2d 299, 302 (3 Cir. 1955).

The order of the Board will be enforced.