**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 340, AFL-CIO, Respondent.**

No. 17425.

United States Court of Appeals Ninth Circuit.

April 10, 1962.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost Asst. Gen. Counsel, Melvin J. Welles and Russell Specter, Attys., N. L. R. B., Washington, D. C., for petitioner.

Neyhart & Grodin, by Joseph R. Grodin and Duane B. Beeson, San Francisco, Cal., for respondent.

Before HAMLEY and BROWNING, Circuit Judges, and ROSS, District Judge.

HAMLEY, Circuit Judge.

The National Labor Relations Board has petitioned this court to enforce its order entered against International Brotherhood of Electrical Workers (I.B.E.W.), Local Union 340, AFL-CIO. Local 340, which resists enforcement of the order, represents employees in the Sacramento Valley who are skilled in the installation of wiring in connection with construction work. Such an affiliate of the I.B.E.W. is known as a "wireman's" local.

Local 340 maintains a collective bargaining agreement with the Sacramento Valley Chapter of the National Electrical Contractors' Association, of which Walsh Construction Company (Walsh) is a member. Walsh is engaged in the drilling of tunnels, and has repair and maintenance yards in Oroville, California. Under the terms of the agreement Local 340 serves as the exclusive source of referrals of electrical workers for employment at the Walsh yards.

Local 340 refused to refer to Walsh, for employment at the Oroville yards, one Jack L. Wood. Wood, although affiliated with the I.B.E.W., was a member of local 800, a so-called "railroad" local. Members of a "railroad" local are primarily skilled in the repair and maintenance

of heavy duty electrical equipment such as that used by Walsh.

Because of this refusal, unfair labor practice charges were filed against Local 340, and a hearing was had before a Board trial examiner. The examiner found that the refusal to refer Wood for employment with Walsh was motivated by a desire to prefer members of Local 340, or other "wireman's" locals, over members of "railroad" locals. The examiner concluded therefrom that Local 340, in violation of section 8(b)(2) of the National Labor Relations Act, 29 U.S.C. A. § 158(b)(2), had caused Walsh to violate section 8(a)(3) of the Act, 29 U. S.C.A. § 158(a)(3), by discriminating in the hiring of employees for the purpose of encouraging membership in a labor organization, i. e., Local 340.

On review, the Board adopted the findings and conclusions of the examiner with certain additions and modifications. It was ordered that Local 340 cease and desist from this declared unfair labor practice and make Wood whole for any loss of pay he may have suffered since February 12, 1960.

In the agency hearing Local 340 did not deny that it had declined to refer Wood to the Walsh job. Nor did it deny that if such refusal was motivated by a desire to prefer members of Local 340 over members of other unions, an unfair labor practice would be involved.[1] It did, however, deny that such refusal was motivated by a desire to prefer members of Local 340. It here contends, as its sole reason for resisting enforcement of the order, that the Board's finding of such motivation is not supported by substantial evidence.

Evidence tending to prove unlawful motivation must ordinarily be circumstantial in character. It is not expected that the officers or representatives of a union will record unlawful motivation in such a way as to constitute direct evidence. The principal circumstances relied upon by the examiner and Board were those having to do with Wood's effort to obtain a union reference to Walsh as an electrical workman with special skills, and the union's reaction thereto.

Local 340 maintains a classification system governing the order of dispatch of applicants for employment. Under this system there are five so-called "groups" by means of which workmen are classified on the basis of experience, passage of an examination, residency in the area, and length of employment under the collective bargaining agreement.

Group I is for those having the maximum requirements. With each succeeding group the qualifications are less stringent. Dispatch to available work is on the basis of group classification so that applicants in a lower numbered group enjoy preference over all applicants in higher numbered groups. There is a recognized exception to this group system in the case of the referral of employees in response to an employer's request for a man with special skills.[2]

On December 23, 1959, Wood reported to respondent's Chico hiring hall seeking

---

1. By section 8(b) (2) and (a) (3) of the Act, Congress has forbidden union interference with jobs where it is shown first, that a union has attempted to cause or succeeded in causing an employer to discriminate, and second, that such discrimination tends to encourage or discourage union membership. See Local 357, Intern. Broth. of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11; Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 42–43, 74 S.Ct. 323, 98 L.Ed. 455.

2. In this regard Article IX, § 4c of the collective bargaining agreement provides:
"When the Employer states bona fide requirements for special skills and abilities in his requests for applicants, the Business Manager shall refer the first applicant on the referral list possessing such skills and abilities.
"The Business Manager, when referring applicants with special skills shall take into consideration the applicant's own estimate of his ability to perform the work requiring such special skills, the applicant's record of experience on such work and the Business Manager's knowledge, if any, of the estimate which contractors have made of the applicant's skills and abilities to perform such work."

work. Stanley Hamilton, business agent and dispatcher at that hiring hall registered Wood in Group III of the classification system. Wood mentioned to Hamilton on this occasion that he had worked for Walsh at its Oroville yard.

Between December 23, 1959 and February 5, 1960 Wood returned to this hiring hall on an average of twice a week, each time asking Hamilton if there were any job vacancies. Early in January someone told Wood that he was supposed to notify Hamilton in writing that he was available for work. Wood asked Hamilton if that was required. Hamilton said he knew that Wood had been in the hall, and that Wood could send in a post card notification if he wanted to. Hamilton did not offer any book to Wood for his signature.

In fact the rules for the operation of this hiring hall required persons desiring work to "verify" their availability for work by initialing a dispatch book, noting the dates upon which they report to the hall. These rules are posted for inspection by applicants but Wood had not seen the posted rules and was not aware of the one requiring "verification" in this manner.

On January 5, 1960, Walsh began requesting men skilled in lead burning, welding and DC battery repair under the special skills provision of the collective bargaining agreement. On January 15, 1960, Rudolph C. Shulz, superintendent of Walsh's Oroville yards, requested the Chico hiring hall of Local 340 to dispatch his son-in-law Merridth Ward, to Walsh. Hamilton told Shulz that Ward would have to come to the union hall and "sign the book." Ward registered on January 22, 1960, which was about a month after Wood had registered.

Through the month of January, 1960, respondent did not dispatch anyone to Walsh although Wood was available for work and possessed the necessary skills. On February 5, 1960, Wood made certain that the union knew that he possessed the special skills needed for the Walsh job by listing such skills on his dispatch slip. On the same day, however, Arnold Olds, a union member, registered for work and was immediately dispatched to Walsh. Shulz rejected Olds when the latter conceded that he did not have the necessary qualifications.

A week later, on February 12, 1960, respondent dispatched Ward to the Walsh plant. When Wood asked Ward why he had been dispatched first in view of Wood's earlier registration, Ward replied that Hamilton had said that Wood had not "verified" his availability for work until after Ward had registered in Group IV. Thereafter Wood "verified" by initialing the dispatch book, this being the first actual notice he had received of that requirement.

Two weeks after the union referred Ward, Shulz requested another employee having special skills. Shulz had earlier mentioned Wood's name to Hamilton as qualified for the job, and repeated the request for Wood on subsequent calls.

Shulz' latest request was open until March 18, 1960. On that date Wood spoke to Hamilton about the job and asked "How about me?" Notwithstanding the fact that Walsh's needs for men with special skills were openly talked about at the union hall, Hamilton replied to Wood, "I don't know anything about it." A few minutes later Wood met another electrician named Wheeler, a member of Local 340, and told him about the Walsh opening. Wheeler went in to speak to Hamilton and after several minutes came out of the hall accompanied by Hamilton.

As they passed Wood, Wheeler waved a clearance slip at him. Then Hamilton and Wheeler drove out to the Walsh yard at Oroville, Wood following in his car. At the yard Wood walked up to the place where Shulz, Wheeler and Hamilton were talking and asked Shulz if two men were needed. Shulz said no. Wheeler then handed Shulz his dispatch card and was employed.

After this incident Wood asked Hamilton about the Walsh job every week when he went to the hall to sign the book. Usually Hamilton replied that he did not

know anything about it. Shulz had in fact requested another man having special skills about two weeks after hiring Wheeler.

Local 340's business manager, Joe Campbell, then met with Shulz to discuss the continuing requests to the hiring hall for men with special skills. Campbell told Shulz that Local 340 was of the opinion that Shulz was attempting to obtain Wood out of order under the hiring procedure. Shulz denied this and Campbell assured him that the union could furnish Walsh with other qualified applicants who had a higher priority.

Thereafter, in April and May, two additional men were referred to Walsh from the hiring hall. One of these was dismissed after a half day trial and the second was rejected after an interview. Wood was never referred. Hamilton told Wood that the Sacramento railroad local had available jobs for referral, and also suggested that Wood might more easily obtain work through the Marysville hiring hall of Local 340. Of the several men dispatched to the Walsh job, two were not members of Local 340, but held cards in sister "wireman's" locals.[3]

In an effort to combat the inference that this course of union conduct was unlawfully motivated, the union produced evidence in support of its contention that entirely innocent purposes were involved. One such asserted purpose was the union's resistance to what it considered Walsh's attempt to by-pass the union's normal referral procedure. The other was its asserted resistance to what it considered Walsh's attempt to "play favorites" by requesting Wood by name.

The examiner and Board rejected these suggested alternative motivations, finding that they were inconsistent with the union's actual course of conduct. In this court respondent does not contend that the Board was required to accept its explanation of the union motivation in refusing to refer Wood. But it argues that the examiner and Board incorrectly reasoned that rejection of Local 340's explanation for its conduct established the illegality of the motivation. Such reasoning, respondent argues, runs counter to the rule that the Board's general counsel, in prosecuting the case, has the burden of proving unlawful motivation.

Respondent is correct in stating that the general counsel had the burden of proof. See Pittsburgh-Des Moines Steel Co. v. N.L.R.B., 9 Cir., 284 F.2d 74, 83–84. It is likewise true that, as a general proposition, to disprove a defense is not to prove the affirmative elements of a violation.

But here there was substantial circumstantial evidence tending to show unlawful motivation. The testimony showed not only that respondent had refused to refer Wood but that it did so in a manner transparently indicating a purpose to prefer members of Local 340, or of other wireman's locals. The warrant for such an inference was enhanced when respondent's asserted alternative motivations were not substantiated and when the various excuses given Wood from time to time were exposed as false.

In large part the findings as to motivation represent an evaluation as to credibility. As to that, we are bound to accept the examiner's appraisal. The inferences which the examiner and Board drew from the testimony the examiner found believable seem altogether reasonable and, indeed, almost compelled. We hold that the findings of fact as to unlaw-

---

3. The examiner and Board also relied on other circumstantial evidence not directly related to Wood's efforts to obtain a referral to Walsh as a man with special skills. Some of this evidence pertained to remarks made to him by union representatives tending to indicate resentment that a member of a "railroad" local would attempt to obtain employment through Local 340's hiring hall. Other such evidence had to do with difficulties encountered by Wood in his effort, which proved fruitless, to gain membership in Local 340. Respondent argues that unwarranted inferences were drawn from this evidence. For the reasons hereinafter indicated, we find it unnecessary to discuss the probative value of this supplemental evidence.

**828**

ful motivation are supported by substantial evidence and that it was not error to conclude therefrom that respondent had engaged in the unfair labor practice as charged.

The petition for enforcement is granted.