339 F.2d 728
 119 U.S.App.D.C. 229
 The LUMMUS COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 80, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES
OF the PLUMBING AND PIPE FITTING INDUSTRY OF the
UNITED STATES AND CANADA, AFL-CIO, Respondent.
 Nos. 17943, 17981.
 United States Court of Appeals District of Columbia Circuit.
 Argued Dec. 13, 1963.
Decided June 11, 1964.
 
 Mr. John J. Donovan, with whom Miss betty Jane Southard, Washington, D.C., was on the brief, for petitioner in No. 17943. Mr. Roger H. Muzzall, Washington, D.C., also entered an appearance for petitioner in No. 17943.
 Mr. Hans J. Lehmann, Attorney, National Labor Relations Board, with whom Mr. Arnold Ordman, General Counsel, Mr. Dominick L. Manoli, Associate General Counsel, Mr. Marcel Mallet-Prevost, Asst. General Counsel, and Mr. Allison W. Brown, Jr., attorney, National Labor Relations Board, were on the brief, for respondent in No. 17943 and petition in No. 17981.
 Mr. Patrick C. O'Donoghue, Washington, D.C., with with Mr. Martin F. O'Donoghue, Washington, D.C., was on the brief, for respondent in No. 17981.
 Mr. Question O. Young, Washington, D.C., filed a brief on behalf of National Constructors Association and the Painting and Decorating Contractors of America, Inc., as amici curiae.
 Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and WASHINGTON, Circuit Judge.
 PRETTYMAN, Senior Circuit Judge:
 
 
 1
 The Lummus Company petitions for court review of a decision and order of the National Labor Relations Board, which held the Company to have violated Section 8(a)(3) and (1) of the National Labor Relations Act.[1] The Board in the same decision held respondent Local 80 to have violated Sections 8(b)(2) and 8(b)(1)(A).[2] The Board has petitioned for enforcement of its order against the Union and cross-petitioned for enforcement against the Company. The several petitions were consolidated here.
 
 
 2
 The controversy revolves around a hiring hall agreement, two brothers named Kivlin, and a business agent of our respondent Union, Local 80. This Union has a collective bargaining agreement with the Delaware Mechanical Contractors Association, which provides for an exclusive hiring hall for a designated territory. The Lummus Company is not a member of this Association, nor is it a signatory to the contract; but during the relevant period it considered itself bound by the hiring provisions by virtue of an agreement with the International with which Local 80 is affiliated.
 
 
 3
 James and John Kivlin are welders and members of Local 420, a sister Local to respondent Local 80. Three dates material to the controversy are February 22, March 14 or 15, and May 22, 1961. Versions of all the material incidents differ, and the examiner was compelled to resolve acute questions of credibility. He did so with long and careful discussions of the evidence. His findings are ample supported, and we follow them in our recitation of the facts. On or about amply supported, and we follow them in referred by Local 80 to a jobsite of the Bechtel Corporation at Newcastle, Delaware. This company was in no way related to Lummus. Kivlin was there given a welding test by one Baffone, an employee of Bechtel, who happened to be a member of Local 80. Kivlin did not pass the test. Embittered over this failure, and feeling that Baffone had not been fair to him, Kivlin went to the Bechtel office to lodge a complaint but was unsuccessful. He then returned to the Local 80 hall, where he engaged in a 'heated' discussion with Charles Kennedy, the business agent for Local 80. Some weeks later, on March 15th,[3] the two Kivlins went back to the Local 80 hall seeking referral. Upon arrival they reported to Kennedy. James Kivlin told Kennedy that they had been sent by their own business agent, to which Kennedy remarked, 'I remember you from before. You had a fight with one of my executive board members. You gave him a hard time.' Although James Kivlin denied such an incident Kennedy told him, 'You ain't working here.' Kennedy then inquired as to the identity of John Kivlin and, upon learning that he was a brother to James, stated, 'You ain't working here either.'[4] James then asked about the hiring list and was told, 'I told you, you weren't working here.' A bitter argument ensued between James Kivlin and Kennedy, and Kennedy ordered the Kivlins to leave his office.
 
 
 4
 John Kivlin subsequently obtained work through another local. He did not thereafter have any contact with Local 80. So far as the record shows, he at no time had contact with Lummus. It will be noted that the Kivlins had no dealing or contact whatever with Lummus on February 22nd or March 14th-15th.
 
 
 5
 Some two months later, on or about May 22nd, James Kivlin returned to the hiring hall for the express purpose of making amends with Kennedy. The latter met him outside the hall and remarked, 'There is no use you hanging around here, you are going to get hurt.' With that Kivlin left and did not thereafter return to the hall.
 
 
 6
 Kivlin then went, that same day, to the Lummus Company's jobsite at Claymont, Delaware, and was there approached by Local 80's job steward, who asked for his referral slip. Kivlin said he did not have one because Kennedy would not refer him. The job steward told him to leave the site. He also told Lummus's timekeeper not to give Kivlin an application. Kivlin was however allowed to fill out an application, but it was then set aside. Kivlin was sent to the manager of the Company's employment office, one Gibson. Gibson explained that the was required to obtain all his men from Local 80, and Kivlin asked, 'What if you can't get a ticket out of Local 80?'. Gibson started to explain when the steward burst in and shouted that Kivlin was not going to work. Gibson then told Kivlin that the requird number of welders had already been hired and that if Kivlin would obtain a referral from Local 80 he would be considered for future employment.
 
 
 7
 In respect to the Company (Lummus) the trial examiner concluded that the complaint should be dismissed, noting that John Kivlin had never applied for work with Lummus and that at the time Local 80 refused to refer James Kivlin, i.e., on March 14th-15th, Lummus was not using the hiring hall. He further found that on May 22nd Lummus had in fact hired the required number of welders and consequently had not violated the Act by turning James Kivlin away. The Board, one member dissenting, reversed the examiner in respect to the Company, holding that the Local was acting as agent for Lummus by virtue of the agreement.
 
 
 8
 In respect to the liability of Local 80 the Board said:
 
 
 9
 'We find, in agreement with the Trial Examiner, that Respondent Local 80, by refusing the Kivlins the use of its exclusive hiring hall, thus effectively barring them from employment within its jurisdictional area because of the claimed abusive conduct of James Kivlin towards an unnamed member of the executive board, caused Respondent Lummus to deny them employment in violation of Section 8(a)(3), thereby violating Section 8(b)(2) and (1)(A) of the Act.'
 
 
 10
 Three issues are presented for our determination.
 
 
 11
 I. The collective bargaining agreement contained a clause establishing a joint hiring committee composed of equal numbers of union and contractor representatives. The committee was empowered to 'hear and determine any and all disputes or grievances arising out of the operation of the referral system'. In case of a deadlock an impartial umpire was to be designated by mutual agreement of the parties. The decision of the committee or the umpire was made 'final, binding and conclusive on all parties, including applicants.' Lummus and Local 80 contend that the Board should have dismissed the complaint and left the Kivlins to this contractual remedy. The Company and the Local agree that Section 10(a)[5] of the Act places such a decision within the discretion of the Board but argue that this discretion was abused. We disagree.
 
 
 12
 The Kivlins were not parties to the agreement, and the Board found they had no knowledge of the appeal procedure. Furthermore a majority of the Board were of the opinion that this procedure did not provide access to such an impartial tribunal as would justify deference to it. In such circumstances we cannot say that the Board abused its discretion.
 
 
 13
 II. Local 80 argues that the Board erred in finding it in violation of Section 8(b)(2) and (1)(A). It says that a union does not violate the section unless its disparate treatment of an employee is brought about by some union activity of the employee or his union membership, and that the evidence shows Kennedy's acts toward the Kivlins to have been the result of a personal disagreement. Since it seems to us that the refusal to refer the Kivlins was based upon an incident keyed to union membership, we need not embroil ourselves in the controversy over the extent of the statutory proscription, i.e., whether a discrimination based entirely upon causes not related to union membership or activity is violative of the statute. See, e.g., N.L.R.B. v. Miranda Fuel Co., Inc., 326 F.2d 172 (2d Cir. 1963).
 
 
 14
 Section 8(b)(2) makes it an unfair labor practice for a union or its agents to cause or attempt to cause an employer, by discrimination in regard to hire, tenture, or any term or condition of employment, to encourage or discourage membership in any labor organization. 'The policy of the Act is to insulate employees' jobs from their organizational rights.'[6] And the Supreme Court has recently pointed out that the Act 'aims at every practice, act, source or institution which in fact is used to encourage and discourage union membership by discrimination in regard to hire or tenure, term or condition of employment.'[7] And in the Radio Officers case, the Court said the phrase 'union membership' includes membership in good standing.[8]
 
 
 15
 Of course not every union attempt to influence employer action which in turn encourages or discourages union membership violates the Act. The Local 357 case[9] made it clear that whenever a union functions properly the encouragement of union membership is a natural by-product; and a union pursuing proper objectives will often cause an employer to take action which results in disparate treatment among employees; a disparity may develop from perfectly proper steps. In such cases the Act is not violated.[10] However, if the union's action, directed to an employer, was intended to discipline an individual or a particular group for violation of union rules,[11] or to encourage individuals to accept the authority of union officers,[12] or to obtain advantages for union members over non-members,[13] such action constitutes an unfair labor practice; it breaches the wall erected by the Act between organizational rights and job opportunities. Intention becomes the touchstone; in determining whether the Betty Jane Southard, Washington, D.C., purpose' or 'real motive' behind the actions of the unions should be ascertained.[14] And here, as in every other fact-finding, inferences from circumstances are permissible. Some conduct, particularly conduct for which no legitimate purpose is shown, may by its very nature contain implications of the intent.[15] In such circumstances the Board may properly find that the encouragement W. Brown, Jr., Attorney, National Labor was the natural foreseeable consequence respondent in No. 17943 and petitioner in actor must have intended that result.
 
 
 16
 In the case at bar the trial examiner D.C., with whom Mr. Martin F. tirade against James Kivlin he told him that the reason for his refusal to refer
 
 
 17
 Mr. Quentin O. Young, Washington, of his abusive conduct towards an unnamed Constructors Association and The Painting Board.' So far as the record shows, Kennedy did not attempt to justify the action on any other ground. He chose to tell these men they could not obtain work from his hall because James Kivlin had had a fight with a Union board member and had given him a hard time. This was a clear equivalent of saying to them, 'If you get into a fight with a member of the executive board of the Union, you don't get work in this territory.' Anybody would so understand what Kennedy said. If he had put his refusal upon some other ground we would have another case. He did not do so. Moreover he did not assign this reason as an afterthought. He told it directly to the Kivlins at the time he refused to refer them.
 
 
 18
 On these facts we hold that the Board was justified in finding Local 80 in violation of 8(b)(2) and (1)(A). The Union had the power to cause any company in that area not to hire the Kivlins. It announced it was using that power because Kivlin was insubordinate to union officials. The natural foreseeable consequence of Kennedy's statement was to impel the Kivlins and others to respect the position and accept the authority of Union officials, and Kennedy must be deemed to have intended that result.[16] Thus the refusal of the Union to refer caused a discrimination in regard to hire, the intent and effect of which was to encourage Union membership. This is the definition of an unfair labor practice in Section 8(b)(2). The Board correctly ruled that Local 80 could not escape responsibility for that act.
 
 
 19
 The Second Circuit's recent decisions in Local 294[17] and Miranda Fuel Co., supra, are not applicable here. They dealt with union treatment of employees for causes unrelated to union matters.
 
 
 20
 Before leaving the discussion of the Union's liability under the statute, we note, because it becomes important to a construction of sections applicable to employers, that a union may violate the statute by causing any and all employers, without individual identification, to discriminate, etc. Thus, as in the present case, if a union has an exclusive hiring hall for all employers having work in a given area, and it refuses to refer to any employer whatsoever, for the proscribed reasons, it violates the Act.
 
 
 21
 III. Lummus contends that that Board erred in holding it in violation of Section 8(a)(3) and (1). We agree.
 
 
 22
 These subsections make it an unfair labor practice for an 'employer' to interfere in designated ways with employees' organizational rights, and the Act defines 'employer' as including 'any person acting as an agent of an employer, directly or indirectly'.[18] The term 'agent' came into the Act with Taft-Hartley (the Wagner Act had defined 'employee' to include 'any person acting in the interest of an employer, directly or indirectly'), and the legislative history makes it clear that this change and the addition of Section 2 (13)[19] were intended to make the common law of agency applicable to employers and labor organizations alike.[20] But a flat declaration of principal-agent relationship is not enough in these cases. 'Respondent superior' is premised upon the proposition that the agent is under the complete control of the principal within the area of the agent's authority. But this broad generality cannot be applied without specification in the labor relations field. The basic thesis for the whole of modern thought in this area is that the representative of the employees is not, cannot be, and must not be under the complete control of the employer. Therefore in this area the relationship of principal and agent, in so far as it carries with it the concept of principal control over the agent and its consequent doctrine of respondeat superior, must be carefully delineated and applied with perceptive selectivity. So it seems to us that the facts in the particular incident under review must enter into the consideration and also into the conclusion.
 
 
 23
 Lummus was not a direct contractor with Local 80. It was a member of an unincorporated national association of construction companies, which association, on behalf of its members, negotiated contracts which international unions establishing general terms and conditions of employment. One such contract of the association was with the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada. Local 80 was affiliated with that international union. This Local had a contract with the Delaware Mechanical Contractors Association, which represented employers in the Delaware area. That contract established the hiring hall. The agreement included all contractors party to the agreement and any 'out-of-town contractor who adopts or works under this agreement'. Lummus did not belong to the Delaware Contractors Association. Its principal office was in New York, and it performed construction work in several states. But it deemed itself bound by the Local 80-Delaware agreement by virtue of the agreement between the national association of contractors and the international union.
 
 
 24
 None of the incidents of February 22nd or March 14th-15th concerned Lummus. So far as the record shows, Lummus was not actually using the hiring hall at that time. In so far as those incidents involved an employer, they involved the Bechtel Corporation, in no way related to Lummus. On May 22nd, however, Lummus was involved. On that day James Kivlin went to the Lummus employment office and was refused work after an exchange of words, principally with the shop steward representing Local 80. Gibson, the Lummus employment officer, told Kivlin he had already hired all the welders he needed that they. The examiner found he truly had done so. The examiner inquired into this incident with meticulous care, since there was a question of credibility here. He found that Lummus had on May 19th (three days prior to the incident) requisitioned six welders to report for work at eight o'clock on the morning of May 22nd. The employment officer phoned that requisition in to Local 80. Six welders, referred by the Local, reported on the 22nd and were hired.
 
 
 25
 John Kivlin was not involved in the May 22nd affair. After March 15th he applied for and obtained a referral slip from Local 26 and went to work for Bechtel Corporation, where he remained indefinitely, so far as the record shows.
 
 
 26
 The Board held that Lummus must cease and desist from 'encouraging membership in Local 80 * * * by refusing to employ James Kivlin and John Kivlin' and from discriminating against James Kivlin and John Kivlin; and must, jointly and severally with Local 80, 'make the Kivlins whole for any loss of pay they may have suffered as a result of the discrimination against them relating to loss of employment opportunities with Respondent Lummus.'[21] It dated the loss of pay from March 15th.
 
 
 27
 As we have said, in ruling on Lummus the Board reversed the trial examiner. It did so upon the ground that the discriminatory acts of Local 80 were chargeable to Lummus, the Local being the agent and Lummus the principal.
 
 
 28
 The question as it relates to February and March differs from the question as it relates to the May affair. The facts differ. Referring to the events of February 22nd and March 14th-15th, the question is: If an association of employers has a hiring hall agreement with a union, is every member of the association severally liable for any isolated discriminatory act of the union, even if that employer was not hiring at the time of the act and did not know or have reason to know of it? Stated otherwise, can an employee who is discriminated against by such a union put the burden of his damage upon any employer-member of the contracting association he may select?
 
 
 29
 It seems to us that 'plain everyday common sense' (using the trial examiner's phrase) dictates the reverse of the Board's view. Labor relations are practical matters. They are not finespun legalistic theories. Their basic premise is the bargaining table. So we think that in applying the responsibility of an employer for the acts of a union the facts of the case must be taken into account. The conclusion must be realistic in the circumstances.
 
 
 30
 It is true that, where an employer who is a party to an exclusive hiring-hall agreement either has actual notice, or may reasonably be charged with notice, that an applicant has been unlawfully denied referral by the union, the employer's refusal to hire, if based upon the applicant's failure to obtain referral, is a violation of Section 8(a)(3) and (1).[22] And, where the agreement itself, either on its face or by reference to another agreement or to union rules, requires discrimination, or where the discriminatory acts were widespread or repeated or notorious, the employer might reasonably be charged with notice of those acts. But this is not the situation here. The Chairman of the Labor Board, dissenting in this case, expressed the matter this way:
 
 
 31
 'I think that this case presents a situation which calls for other than a mechanical application of the doctrine of respondeat superior. Without laboring the point, I hesitate to attribute to an employer statutory culpability, which is predicated on a finding of discrimination, in a situation where the employer's action is dictated by a lawful hiring agreement and the employer is not apprised of and, so far as the record shows, is unaware of unlawful action taken by the other party to the agreement. Absent a showing of authorization or ratification express or implied of the ultra vires action of the Union, I think the prerequisites for a finding of unlawful discrimination have not been established.'
 
 
 32
 In so far as the February and March incidents are concerned, there was no involvement of Lummus except its undertaking to be bound by a non-discriminatory hiring-hall agreement. It did not participate in the incidents and had no actual knowledge of them. They were isolated incidents.
 
 
 33
 In respect to the May 22nd incident the questions are whether Lummus discriminated against James Kivlin when he applied to its employment officer and that officer failed to hire him, and whether Lummus on that day so ratified the action of the union in the blanket denial of referral as to make itself liable for that denial nunc pro tunc. The facts require that both questions be answered in the negative. James Kivlin was not hired on that day, because there was no job available. Of course an employer's liability is not suspended merely because he had no jobs available at the time he turned the applicant away. If the employer has express or implied notice of an illegal denial by the union, he is or may become liable, even if jobs are not then available,[23] if he indicates to an applicant that he will not be hired when openings appear unless he has been referred by the union.[24] The record, however, does not support a conclusion that Lummus either had notice or had probable cause to inquire into the nature of Kivlin's difficulties with the union.[25] The employment officer testified that 'perhaps as many as a thousand' pipe fitters and welders had been hired on this job, that all these men were hired through Local 80, and that the Kivlin complaint was the first complaint. James Kivlin himself did not complain during the two months he says he was barred. His brother John went ahead and got a job. James Kivlin made no reference to his experiences at the hall. There was a grievance procedure provided in the agreement. Kivlin did not know of that procedure, but Lummus did not know Kivlin did not know of it. The Company might well have thought that grievances would be taken care of through the grievance procedure. Kivlin's question-- 'What if you can't get a ticket out of Local 80?'-- was too equivocal to give Lummus reasonable grounds for suspecting that Kivlin had actually been turned down by the union's business agent, and for illegitimate reasons.[26]
 
 
 34
 The Board relies upon the Second Circuit's opinion in Morrison-Knudsen Co. v. N.L.R.B.[27] to support its position. That case involved discrimination by a hiring hall based upon membership in the referring local. Among other things the local required non-members to pay a weekly license fee called a 'dobie'. The court was careful to point out that the employer had knowledge of the union's collection of this 'dobie', and it is clear that the union was performing referral services for the company at the time of the discrimination. Thus the case is wholly different on its facts. The other cases cited to us by the Board are likewise distinguishable; they involved either illegal agreements or employer knowledge of the discriminatory practices.
 
 
 35
 Those portions of the Board's order which relate to Local 80 are affirmed and will be enforced. In so far as the order relates to the liability of The Lummus Company, it is reversed.[28]
 
 
 36
 So ordered.
 
 
 
 [1]
 49 STAT. 452 (1935), as amended, 29 U.S.C. 158(a)(3) and (1)
 
 
 [2]
 Added by 61 STAT. 141 (1947), 29 U.S.C. 158(b)(2) and (1)(A)
 
 
 [3]
 The examiner said March 14th or 15th; the Board said March 15th
 
 
 [4]
 The trial examiner found that James Kivlin then said, 'Look, I have some rights,' to which Kennedy replied, 'Down here you don't have any rights.'
 
 
 [5]
 49 STAT. 453 (1935), 29 U.S.C. 160
 
 
 [6]
 Radio Officers Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954)
 
 
 [7]
 Local 357, International Bro. of Teamsters etc. v. N.L.R.B., 365 U.S. 667, 676, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961)
 
 
 [8]
 Supra note 6, 347 U.S. at 40, 74 S.Ct. at 335. See also N.L.R.B. v. Local 542, International U. of Operating Engineers, 255 F.2d 703, 705 (3d Cir. 1958)
 
 
 [9]
 Supra note 7
 
 
 [10]
 See N.L.R.B. v. Local 294, International Bro. of Teamsters, 317 F.2d 746 (2d Cir. 1963); International Longshoremen's & Warehousemen's U., Local No. 10, 121 N.L.R.B. 938 (1958); Bricklayers, Masons & Hod Carriers, Building & Common Laborers U., Local 7, 135 N.L.R.B. 865 (1962)
 
 
 [11]
 N.L.R.B. v. Local 490, International Hod Carriers, 300 F.2d 328 (8th Cir. 1962); N.L.R.B. v. Local 450, International U. of Operating Engineers, 281 F.2d 313 (5th Cir. 1960), cert. denied, 366 U.S. 909, 81 S.Ct. 1084, 6 L.Ed.2d 235 (1961)
 
 
 [12]
 Brunswick Corp., 135 N.L.R.B. 574 (1962), enforced sub nom. N.L.R.B. v. Local 65, United Bro. of Carpenters and Joiners of America, 318 F.2d 419 (3d Cir. 1963)
 
 
 [13]
 Local 138, International U. of Operating Engineers, A.F.L.-C.I.O. v. N.L.R.B., 321 F.2d 130 (2d Cir. 1963); N.L.R.B. v. International Bro. of Elec. Workers, Local U. 340, 301 F.2d 824 (9th Cir. 1962); N.L.R.B. v. International Association of Heat & Frost Insulators & Asbestos Workers, 261 F.2d 347 (1st Cir. 1958)
 
 
 [14]
 Local 357, International Bro. of Teamsters v. N.L.R.B., supra, 365 U.S. at 675, 81 S.Ct. 835, see N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963)
 
 
 [15]
 Radio Officers Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., supra, 347 U.S. at 45, 74 S.Ct. 323; Local 357, International Bro. of Teamsters etc., supra, 365 U.S. at 675, 81 S.Ct. 835 (see also concurring opinion 365 U.S. at 678-682, 81 S.Ct. 835); N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 228, 83 S.Ct. 1139 (1963)
 
 
 [16]
 See Brunswick Corp., supra note 11; N.L.R.B. v. Oklahoma City Gen. Drivers, Warehousemen and Helpers, Local U. 886, 235 F.2d 105, 107 (10th Cir. 1956); Bechtel Corp., 120 N.L.R.B. 930 (1958)
 
 
 [17]
 N.L.R.B. v. Local 294, International Bro. of Teamsters, 317 F.2d 746 (1963)
 
 
 [18]
 Sec. 2(2), National Labor Relations Act as amended, 61 STAT. 137 (1947), 29 U.S.C. 152(2)
 
 
 [19]
 61 STAT. 139 (1947), 29 U.S.C. 152 (13): 'In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.'
 
 
 [20]
 See H.R. REP. No. 245, 80th Cong., 1st Sess. 11, 68 (1947), 1 LEGISLATIVE HISTORY OF THE LABOR MANAGEMENT RELATIONS ACT 302, 358 (1948); H.R. CONF.REP. No. 510, 80th Cong., 1st Sess. 31, 36 (1947), 1 LEGIS.HIST. 535, 540; Veto Message of President Truman, 1 LEGIS.HIST. 918; 2 LEGIS.HIST. 1204-05 (remarks of Sen. Taft), 1552, 1556 (Sen. Morse in opposition), 1566 (Sen. Murray in opposition), 1588 (Sen. Pepper in opposition), 1622 (Sen. Taft). Courts have looked to the law of agency. See N.L.R.B. v. International Longshoremen's & Warehousemen's Union, Local 10, 283 F.2d 558, 563 (9th Cir. 1960); N.L.R.B. v. United States Steel Corp. (American Bridge Div.), 278 F.2d 896 (3d Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961); Morrison-Knudsen Co. v. N.L.R.B., 275 F.2d 914 (2d Cir. 1960), cert. denied, 366 U.S. 909, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961). Compare Local 636 of United Association of Journeymen etc. v. N.L.R.B., 109 U.S.App.D.C. 315, 287 F.2d 354 (D.C. Cir. 1961)
 
 
 [21]
 Incidentally, the Board refers to Local 80 as 'the sole and exclusive source of referrals to employment' within its territorial jurisdiction. The Board must have meant trade or work jurisdiction. The agreement which established the hiring hall expressly excluded 'that portion of the work which is * * * recognized as coming within the jurisdiction of Local Union 26'. The trial examiner recited that James Kivlin testified that Local 80 got 70 per cent of the work and Local 26 got 30 per cent. John Kivlin secured a job through Local 26
 
 
 [22]
 See N.L.R.B. v. Lummus Co., 210 F.2d 377 (5th Cir. 1954); N.L.R.B. v. United States Steel Corp. (American Bridge Div.), 278 F.2d 896 (3d Cir. 1960); N.L.R.B. v. George D. Auchter Co., 209 F.2d 273 (5th Cir. 1954); N.L.R.B. v. Construction Specialties Co., 208 F.2d 170 (10th Cir. 1953)
 
 
 [23]
 When it is clear that the employer will not proffer a job in any event, neither the unavailability of work, nor the failure to apply for a particular job, is a valid defense to a discriminatory hiring policy. See N.L.R.B. v. Valley Die Cast Corp., 303 F.2d 64, 66 (6th Cir. 1962); International Union of Operating Engineers, Local 12, 113 N.L.R.B. 655, 662-63 (1955), enforced in so far as here relevant, N.L.R.B. v. International Union of Operating Engineers, 237 F.2d 670, 674 (9th Cir. 1956), cert. denied, 353 U.S. 910, 77 S.Ct. 666, 1 L.Ed.2d 664 (1957); N.L.R.B. v. Waterfront Employers of Washington, 211 F.2d 946, 952-953 (9th Cir. 1954); N.L.R.B. v. Lummus Co., 210 F.2d 377, 381 (5th Cir. 1954). Cf. N.L.R.B. v. Local 803, International Brotherhood of Boilermakers, 218 F.2d 299, 302-303 (3d Cir. 1955)
 
 
 [24]
 In such a situation the measure of the employer's liability for damages should not begin until an opening actually becomes available, for which the previously rejected applicant would have been eligible. To assess damages against the employer from the date the union refused to give the applicant a referral slip, before the employer had notice of any illegality, or before a job became available, would serve no useful purpose and would raise serious questions of fundamental fairness and due process. Damages automatically assessed against the employer from the time he spurned the applicant, before he had a job available, would be punitive; the Board does not have authority to impose punitive damages
 
 
 [25]
 There can be no general rule that even where an employer, under the circumstances of a particular case, could reasonably be held to have been put on notice when the worker applied, the employer violated the statute at the (earlier) time the union unlawfully refused to refer, where the hiring-hall agreement is non-discriminatory on its face. Such a blanket holding would frustrate the functions and jeopardize the operations of hiring-hall agreements, which have been found to be beneficial by courts, the Congress, and the Board. See Local 357, International Brotherhood of Teamsters etc. v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835 (1961); S.REP.No. 1827, 81st Cong., 2d Sess. (1950); Mountain Pacific Chapter of the Associated General Contractors, Inc., 119 N.L.R.B. 883 (1957)
 
 
 [26]
 Judge Washington would add that in his view, if Kivlin had informed Lummus's employment to Kennedy's refusal to refer relating to Kennedy's refusal to refer him, Lummus might well be charged with acquiescence in, or ratification of, the unlawful discrimination
 
 
 [27]
 275 F.2d 914 (1960), cert. denied, 366 U.S. 909, 81 S.Ct. 1082 (1961)
 
 
 [28]
 Judge Bazelon believes the events of May 22nd put Lummus on sufficient notice to hold it liable from that date or from the date which a job next became available