571 F.2d 1017
 97 L.R.R.M. (BNA) 2845, 83 Lab.Cas. P 10,377
 FRUIN-COLNON CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LABORERS INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO,
LOCAL 282, Respondent.
 Nos. 77-1014, 77-1127.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1977.
Decided Feb. 16, 1978.
 
 Ralph Edwards of Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., for Fruin-Colnon Corp., petitioner.
 William R. Stewart, Atty., N.L.R.B., Washington, D. C., for N.L.R.B.; Judith P. Wilkenfeld, Atty., N.L.R.B., Washington, D. C., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., on brief.
 James E. Spain, Briney, Welborn & Spain, Bloomfield, Mo., for Laborers Int'l Union of NA, AFL-CIO, Local 282; Irl B. Baris, St. Louis, Mo., on brief (Irl B. Baris, St. Louis, Mo., withdrew Sept. 22, 1977).
 Before HEANEY, WEBSTER and HENLEY, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The Fruin-Colnon Corporation petitions this Court to review and set aside an order of the National Labor Relations Board requiring it and the Laborers International Union of North America, AFL-CIO Local 282, to reinstate seven employees, and to make them whole for their loss of earnings when they were discharged, laid off or otherwise discriminated against. The Board cross petitions for enforcement of its order.[1] The Board's decision and order is reported at 227 N.L.R.B. 16, 94 L.R.R.M. 1186 (1977). We enforce the order of the Board.
 
 
 2
 Fruin-Colnon was engaged in the construction of the Charmine Paper Plant at Cape Girardeau, Missouri. The collective bargaining agreement between it and Local 282 provided as follows:
 
 Article II. Foremen:
 
 3
 One foreman is required for every eight men. Foremen to be Paid at the rate of $.45 per hour over all other labor foremen. Foremen and general foremen to be appointed by the Union on all jobs over $2,500,000.
 
 
 4
 Fruin-Colnon permitted the Union president and business manager, Fred Kelley, to appoint the general foreman and the foremen on the job. Neither party questions the applicability of Article II.
 
 
 5
 In July, 1975, a number of employees, including Owen Innis, Joe Sachse and William Miller, met to discuss the possibility of holding a new election to oust Kelley and the Union's business agent, Paul Menz. The men were dissatisfied with the manner in which Kelley and Menz were elected to office and the manner in which they ran the Union. As a result of the meeting, a petition was drafted and circulated to Union members on the Charmine and other projects. The petition stated in part:
 
 
 6
 We the following, being duly paid up members of Local 282, and being dissatisfied with our Business Agent and President, wish to inform you, that the last election was illegal in a number of ways.
 
 No. 1
 
 7
 We were not informed by mail, or any other way, that an election was to be held.
 
 No. 2
 
 8
 Of the 20 or 25 members that showed up, their (sic) was no secret ballot. It was decided by hand count only.
 
 No. 3
 
 9
 There was (sic) no books checked at the door, to see if each member's dues were paid in full.
 
 No. 4
 
 10
 Any decenters (sic), if there had been any, would have been out of work for a long time, or would have had other things happen to them. * * *
 
 No. 5
 
 11
 Our Vice President has just resigned, making this statement, that he's not going to jail for anyone. * * * Our money is being misused. Mr. Fred Kelley and Paul Menz have given themselves raises many times, without the knowledge of the Executive Board, and put in the minutes as they saw fit. Never having a meeting or anything.
 
 No. 6
 
 12
 The room we held the election in, could not hold more than 40 or 50 members at the most.
 
 
 13
 This can be proven if need be.
 
 
 14
 Mr. Fred Kelly (sic) and Mr. Paul Menz, conducted the election themselves.
 
 
 15
 In mid-August, Kelley asked Fruin-Colnon to lay off Innis, Sachse and Miller. Fruin-Colnon refused. Thereafter, the three men and four others Leroy Lukefahr, Tom Lukefahr, Jim Schoen and Henry Durham were laid off or discharged. In each instance, Kelley requested that the employee be terminated. The Board found that Local 282 violated § 8(b)(1)(A) and (2) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) and (2), by causing Fruin-Colnon to discriminate against the terminated men with respect to their tenure, and terms and conditions of employment. It also found that Fruin-Colnon had ceded control over the hiring, tenure, and terms and conditions of employment to Local 282. It further found that Fruin-Colnon knew the Union's demands for the termination of Miller, Sachse and Innis were unrelated to their job performance and were predicated solely on Kelley's hostility toward them. Finally, it found that Fruin-Colnon had sufficient knowledge, which any reasonable employer would have exercised, to question why Leroy and Tom Lukefahr, Jim Schoen and Henry Durham were selected for termination; and that notwithstanding that knowledge, it acceded without question to the Union's demands. It concluded that these actions by Fruin-Colnon violated § 8(a)(1) and (3) of the Act.[2]
 
 
 16
 Fruin-Colnon argues that the Union's power has been so institutionalized through the legal and economic structure of the construction industry that the Union alone should bear responsibility for the discharges and layoffs. It further argues that substantial evidence on the record as a whole does not support the Board's finding that the employees were discharged or laid off in violation of the Act. The Union also argues that the discharges do not violate the Act.[3]
 
 
 17
 As we view the case, the discharges and layoffs fall into two categories. The terminations of Miller, Innis, Sachse and Schoen, because they participated in a movement within the Union to oust Kelley and Menz, fall into the first category. The terminations of Leroy Lukefahr, Tom Lukefahr and Durham, who did not participate in that effort but who incurred Kelley's displeasure by other actions, fall into the second category.
 
 
 18
 The law is clear with respect to the first category of terminations. A union violates § 8(b)(1)(A) and (2) of the Act if it causes an employer to discharge or lay off a member of the union for activities within the union. See, e. g., Rust Engineering Company v. N. L. R. B., 445 F.2d 172 (6th Cir. 1971); Lummus Company v. N. L. R. B., 119 U.S.App.D.C. 229, 339 F.2d 728 (1964). An employer who knowingly acquiesces to union pressure to discriminate against employees who engage in union activities violates § 8(a)(1) and (3) of the Act. N. L. R. B. v. Aclang, Inc., 466 F.2d 558 (5th Cir. 1972); Lummus Company v. N. L. R. B., supra; Morrison-Knudsen Company v. N. L. R. B., 275 F.2d 914 (2d Cir. 1960), cert. denied, 366 U.S. 909, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961); National Labor Relations Board v. Lummus Co., 210 F.2d 377 (5th Cir. 1954).
 
 
 19
 We find no merit to Fruin-Colnon's suggestion that an exception to the rule should be made for the construction industry. Various types of hiring halls and seniority arrangements unique to the construction industry are allowed under § 8(f) of the Act, 29 U.S.C. § 158(f). See N. L. R. B. v. Irvin, 475 F.2d 1265 (3rd Cir. 1973). These arrangements contribute to the stability of the industry and protect the rights of those who spend their lives working at a skilled trade. Reasonable rules may be established but the hiring halls and arrangements must be administered in a nondiscriminatory manner. Other circuits that have considered the question have not made an exception for the construction industry. United Brotherhood of Carpenters & Joiners of America, Local 1281, AFL-CIO (Raber-Kief, Inc.), 152 N.L.R.B. 629, 59 L.R.R.M. 1154, enf'd, 369 F.2d 684 (9th Cir. 1966); J. J. Hagerty, Inc., 139 N.L.R.B. 633, 51 L.R.R.M. 1349, enf'd in part sub nom. Local 138, Internat'l U. of Operating Engineers v. N. L. R. B., 321 F.2d 130 (2d Cir. 1963). We adopt the position of these circuits.
 
 
 20
 We turn now to the question of whether the employees in the first category were in fact discharged or laid off for Union activities. In our view, substantial evidence on the record as a whole indicates that they were.
 
 
 21
 William Miller began working on the Charmine project on June 10, 1975, as a pipefitter. He continued to work until his discharge on September 4. He was one of the Union members who met at the "61 Club" in mid-July to discuss the possibility of a new election. In mid-August, Kelley telephoned Louis J. Ebbesmeyer, a company superintendent, and told Ebbesmeyer that he was dissatisfied with Sachse, Miller and Innis because they had been in a tavern complaining about the way the Union was run. Kelley indicated that he would like to have them laid off. No action was taken by the company at that time.
 
 
 22
 On August 25, Bill Kitchen, the general foreman, gathered the employees together and explained that Kelley had sent United Fund subscription cards to the job site. Kelley recommended that each employee contribute a day's wages. Kelley sat on the board of the local United Fund and had indicated to Jim Bollinger, the Union steward, that he wanted to look good. Miller told both Kitchen and Bollinger that he would not contribute a day's wages. Bollinger reported this to Kelley and Kelley replied that he would run Miller off the job on his first opportunity.
 
 
 23
 On September 4, Miller asked Bollinger if he could leave at noon because he had to take his son to the hospital. Bollinger indicated his approval. Miller also asked and received permission from Kitchen. Bollinger, as was his custom, called Kelley to report who was on the job. After learning that Miller left at noon, Kelley told Bollinger to get Miller's check. Kelley also told Bollinger to get the checks of Innis and Sachse, but later relented as to them. Kelley said he was going to get rid of those who were against him. Bollinger explained that Miller received permission to leave the job, but Kelley instructed him to lie and say that Miller never received permission.
 
 
 24
 Bollinger subsequently explained the situation to Kitchen and Kitchen indicated that he would have to go along with Kelley. Bollinger and Kitchen then spoke with Ebbesmeyer and John Ronquist, another superintendent, and explained that Kelley wanted Miller laid off. The superintendents expressed concern that Fruin-Colnon would be caught in an intra-Union fight, but acceded to the request and fired Miller.
 
 
 25
 The foregoing clearly shows that Kelley had Miller discharged because of Miller's activities within the Union and that Fruin-Colnon was aware of this fact.
 
 
 26
 Fruin-Colnon and the Union argue that their witnesses refuted much of this evidence and attack credibility determinations made by the administrative law judge. The question of credibility of witnesses is primarily one for determination by the trier of facts. N. L. R. B. v. Payless Cashway Lbr. St. of So. St. Paul, 508 F.2d 24, 28 (8th Cir. 1974); N. L. R. B. v. Luisi Truck Lines, 384 F.2d 842, 846 (9th Cir. 1967). However, the rule cannot be mechanically applied. If it were, the reviewing court would be compelled to sustain any finding as to which there was conflicting evidence. N. L. R. B. v. Payless Cashway Lbr. St. of So. St. Paul, supra.
 
 
 27
 The record as a whole supports the credibility findings of the administrative law judge.
 
 
 28
 Owen Innis and Jim Schoen were laid off on October 10. Shortly before that date, a reduction in the work force was ordered. Bollinger and Kelley selected the individuals to be laid off. They sat down with a roster, struck off the names of those laid off and transferred the names to a separate sheet of paper. Kelley immediately picked out the names of Innis and Schoen. He commented to Bollinger that he wanted to get rid of them for sure and that they would never again be referred through the hall. The choices made by Kelley and Bollinger were not questioned by Fruin-Colnon.
 
 
 29
 Innis was a participant in the mid-July meeting at the "61 Club," and was mentioned in Kelley's telephone call to Ebbesmeyer as one of the three men that should be laid off because of Union activity. Schoen participated in several discussions on the job site about a new election for Union officers with Miller and Innis. On one such occasion, Kitchen was present and told them that such talk could cause trouble. Kitchen testified that the men were laid off because the grading and carpentry work was nearing completion. However, the administrative law judge did not credit this testimony since Schoen was working at the time of his layoff as a cement finisher.
 
 
 30
 Thus, there was substantial evidence to show that Innis and Schoen were laid off because of their Union activity and that Fruin-Colnon was aware of this.
 
 
 31
 Joe Sachse began work at the Charmine project on July 14. Sachse was present at the "61 Club" meeting and helped to distribute the petition drawn up there. He was one of the three employees whose termination was demanded by Kelley in his telephone call to Ebbesmeyer. On numerous occasions, Kelley indicated that he wanted to eliminate Sachse because of his criticism of the Union. This included Kelley's attempt to have Sachse and Innis discharged when Miller was discharged.
 
 
 32
 On September 15, Sachse entered the construction site with the intent to leave immediately. The guard at the entrance requested to see his identification badge but Sachse refused. Although all employees were required to show their badges when entering the job site, this rule was not uniformly enforced. On several occasions, the guards did not require employees to show their badges.
 
 
 33
 Sachse approached Bollinger and Kitchen and told them that he was leaving because of personal problems. The guard then approached the group and again requested to see Sachse's badge. Bollinger ordered Sachse to show his badge but Sachse refused. Sachse then left. Shortly thereafter, Kelley called Bollinger into his office and asked if Sachse had refused to show his badge. When he found out that Sachse did not, Kelley stated that he must be discharged because everyone was required to show his badge.
 
 
 34
 During the day, Kitchen spoke with Ebbesmeyer and recommended that Sachse be discharged. Ebbesmeyer did not attempt to independently investigate the facts. He also knew that Sachse was one of the three employees that Kelley wanted to eliminate. Later that same day, Sachse was discharged.
 
 
 35
 Fruin-Colnon and the Union both argue that, in fact, Kelley played no part in the discharge of Sachse. They argue that the evidence shows this was an independent judgment on the part of Fruin-Colnon. The administrative law judge discredited this testimony. He found the testimony to be conflicting and evasive. We agree with this statement. The contention that this was a serious infraction of the company's rules is negated by the fact that numerous others who did not show their badge were not discharged. We also note that Sachse was rehired the next day as a cement finisher. Kelley's motives in recommending Sachse's discharge had nothing to do with a violation of a company rule. In fact, after Sachse was rehired, Kelley called Ward Smith, the project manager, and told him that rehiring Sachse was "a bad and serious mistake." The evidence clearly shows that Kelley had Sachse discharged because of his Union activities and that Fruin-Colnon was aware of this.
 
 
 36
 The intention of the union is the touchstone as to whether it violated the Act in selecting an individual for layoff. The true purpose or real motive behind the action of the union must be ascertained. Lummus Company v. N. L. R. B., supra, 119 U.S.App.D.C. 229, 339 F.2d at 734. A union with the right to select employees for layoff can clearly use reasonable criteria such as seniority, length of service on the job, experience or competence in making its decision. It does not have a right, however, to select a person for layoff for unreasonable, invidious or arbitrary reasons.
 
 
 37
 With respect to the second category of terminations, the law is less clear. In our judgment, the better view is that a union violates § 8(b)(1)(A) and (2) of the Act if it or its agent, adversely affects an employee's job for personal or arbitrary reasons. N. L. R. B. v. International Longshoremen's & W. U., 514 F.2d 481 (9th Cir. 1975); N. L. R. B. v. Hod Carriers' & Construction Lab. U., Local No. 300, 392 F.2d 581 (9th Cir. 1968); Lummus Company v. N. L. R. B., supra. An employer violates § 8(a)(1) and (3) of the Act if it knowingly acquiesces in the union's action.
 
 
 38
 Lummus is precisely on point with respect to the Union's liability. The Court stated:
 
 
 39
 (The local union) argues that the Board erred in finding it in violation of Section 8(b)(2) and (1)(A). It says that a union does not violate the section unless its disparate treatment of an employee is brought about by some union activity of the employee or his union membership, and that the evidence shows (the business agent's) acts toward (a member) have been the result of a personal disagreement. Since it seems to us that the refusal to refer (the members to a job) was based upon an incident keyed to union membership, we need not embroil ourselves in the controversy over the extent of the statutory proscription, i. e., whether a discrimination based entirely upon causes not related to union membership or activity is violative of the statute.
 
 
 40
 Of course not every union attempt to influence employer action which in turn encourages or discourages union membership violates the Act. The Local 357 (365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961)) case made it clear that whenever a union functions properly the encouragement of union membership is a natural by-product; and a union pursuing proper objectives will often cause an employer to take action which results in disparate treatment among employees; a disparity may develop from perfectly proper steps. In such cases the Act is not violated. However, if the union's action, directed to an employer, was intended to * * * encourage individuals to accept the authority of union officers, * * * such action constitutes an unfair labor practice; it breaches the wall erected by the Act between organizational rights and job opportunities. Intention becomes the touchstone; in determining whether the section has been violated, the "true purpose" or "real motive" behind the actions of the unions should be ascertained. And here, as in every other fact-finding, inferences from circumstances are permissible. Some conduct, particularly conduct for which no legitimate purpose is shown, may by its very nature contain implications of the intent. In such circumstances the Board may properly find that the encouragement or discouragement of union membership was the natural foreseeable consequence of the conduct and that the action must have intended that result.
 
 
 41
 Id. 119 U.S.App.D.C. at 234, 339 F.2d 733-734 (citation and footnotes omitted). Here, there is substantial evidence to support the Board's finding that Kelley intended by his action to encourage individual members of the Union to accept the authority of the Union's officers and that Fruin-Colnon knew of Kelley's intent.
 
 
 42
 Leroy Lukefahr began work as a laborer at the Charmine site on June 17, 1975. Approximately a week before his discharge, Lukefahr's foreman, Claude Kelley, criticized Lukefahr for pushing work off on another employee. Lukefahr strenuously protested the accusation. Claude Kelley retorted that if he couldn't take care of Lukefahr, Bollinger and Fred Kelley would. Lukefahr countered that he was not afraid of Bollinger and Fred Kelley.
 
 
 43
 Shortly thereafter, Lukefahr confronted Bollinger and Fred Kelley during a lunch break in the presence of several employees, including Kitchen. In strong language, Lukefahr told Bollinger and Kelley that he was not afraid of them. As Kelley left the group, he stated to Bollinger and Kitchen that he was going to get rid of Lukefahr.
 
 
 44
 On September 4, Lukefahr did not report to work. Tom Lukefahr, Leroy's brother, informed Kitchen and Bollinger of this when he arrived at work. Both Kitchen and Bollinger told Tom Lukefahr that this was "no problem." During the day, Bollinger telephoned Kelley and reported who was working. Upon learning that Leroy Lukefahr had not reported to work, Kelley told Bollinger to get Lukefahr's check.[4] After the telephone conversation, Bollinger went to Kitchen's office and explained to Kitchen that Kelley wanted Lukefahr discharged. Kitchen stated that he would comply with Kelley's order. Bollinger and Kitchen then went to see Ebbesmeyer and Ronquist. Ebbesmeyer and Ronquist stated that they did not want the company embroiled in an intra-Union fight, but agreed to discharge Lukefahr. Kitchen and Bollinger then informed Tom Lukefahr that his brother was discharged and gave him Leroy Lukefahr's check.
 
 
 45
 The administrative law judge recognized that Leroy Lukefahr was not a model employee and had an absenteeism problem. However, there was no evidence that Fruin-Colnon contemplated Lukefahr's discharge until directed to do so by Bollinger and Kitchen. Kelley wanted Lukefahr discharged because of Lukefahr's disrespectful conduct toward him and not because of Lukefahr's job performance. There was substantial evidence to support the Board's findings. There was also substantial evidence to show that Fruin-Colnon knew of Kelley's intent.
 
 
 46
 Tom Lukefahr began work on the Charmine project on July 14. On several occasions, Lukefahr complained to Bollinger and Kitchen that he should be receiving additional compensation when he operated special tools. Bollinger passed the complaint on to Kelley, who strongly expressed his displeasure with Lukefahr.
 
 
 47
 During the selection process for the October 10 layoff, Kelley chose Lukefahr.[5] The only explanation given to support the layoff of Lukefahr was that the grading and carpentry work was almost completed. The administrative law judge discredited this testimony, however, because not all of the men laid off were engaged in that type of work. Substantial evidence exists to show that Lukefahr was laid off because he had incurred the personal displeasure of Kelley and that the company was aware of this.
 
 
 48
 Henry Durham was first employed by Fruin-Colnon on June 22. Another reduction in the work force was ordered shortly before October 22. Bollinger and Kelley participated in the selection of those to be laid off. As Kelley and Bollinger were making the selections, Lou Payne, a superintendent, entered the room in which they were working and told them that he wanted to keep Durham because Durham was the best man he ever had to lay grade for pipe. The selection process reached the stage in which one more employee had to be laid off and only the names of Henry Durham and Lloyd Kelley remained. Lloyd Kelley was Fred Kelley's uncle. Kelley told Bollinger, "Well I can't lay my uncle off because he owes money to the bank and I am on his note." Kelley then placed Durham's name on the list of employees to be laid off.
 
 
 49
 Lloyd Kelley was not a desirable worker. Ebbesmeyer, in fact, tried to have Lloyd Kelley discharged on several occasions. Durham, on the other hand, was a satisfactory worker as shown by Payne's statement. The only justification for Durham's layoff proffered by Fruin-Colnon was that the grading work was nearing completion. The administrative law judge did not accept this justification because Payne's request indicated a continuing need for grading work. Thus, substantial evidence indicates that Durham was laid off for reasons personal to Kelley and unrelated to Durham's job performance and that Fruin-Colnon knew this.
 
 
 50
 The order of the Board is enforced.
 
 
 
 [1]
 The Union also requests that we refuse to enforce the Board's order insofar as it relates to the use of force and violence by Union representatives against Joe Sachse, Owen Innis and Dallas Dover. The order in this regard is supported by substantial evidence on the record. We, therefore, enforce it
 
 
 [2]
 The Board also found that the Union had violated § 8(b)(1)(A) and (2) of the Act by refusing to appoint Miller as a foreman pursuant to the provisions of the collective bargaining agreement with Fruin-Colnon, and that the Union and the employer had violated the Act by transferring Miller from his regular duties to undesirable jobs. The Board's findings in this regard are supported by substantial evidence on the record as a whole. We, therefore, enforce the Board's order with respect to these violations
 
 
 [3]
 We note that Fruin-Colnon and the Union also object to the Regional Director's consolidation of the Fruin-Colnon case with Blount Bros. Corporation, Case No. 14-CA-8917, Alberici-Fruin-Colnon, Case No. 14-CA-8914; see N. L. R. B. v. Laborers Intern. U. of North America, AFL-CIO, Local 282, et al., 567 F.2d 833 (8th Cir., 1977), and four other cases, Laborers International Union of North America, AFL-CIO, Local 282 (Fruin-Colnon Corporation), Case Nos. 14-CB-3066 and 14-CB-3078, Laborers International Union of North America, AFL-CIO, Local 282 (Alberici-Fruin-Colnon), Case No. 14-CB-3085, and Laborers International Union of North America, AFL-CIO, Local 282 (Blount Bros. Corporation), Case No. 14-CB-3087. Each of these cases involved an allegation of violence by the Union. We hold that the consolidation was proper and that the Board did not err in refusing to sever this case from the others. We also hold that the parties were given a fair hearing. See N. L. R. B. v. Indiana & Michigan Electric Co., 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579 (1943); Barrus Construction Company v. N. L. R. B., 483 F.2d 191 (4th Cir. 1973). Under these circumstances, the question of joinder is one which rests in the sound discretion of the Board. See N. L. R. B. v. Mark J. Gerry, Inc., 355 F.2d 727 (9th Cir.), cert. denied, 385 U.S. 820, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966); National Labor Relations Bd. v. United Mine Workers, 198 F.2d 389 (4th Cir.), cert. denied, 344 U.S. 884, 73 S.Ct. 183, 97 L.Ed. 684 (1952)
 
 
 [4]
 This was the same telephone conversation in which Kelley ordered Miller's discharge
 
 
 [5]
 As previously discussed, Owen Innis and Jim Schoen were also selected